[Cite as *State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections,* 137 Ohio St.3d 45, 2013-Ohio-4489.]

THE STATE EX REL. CINCINNATI FOR PENSION REFORM ET AL. *v.* HAMILTON COUNTY BOARD OF ELECTIONS ET AL.

[Cite as *State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections,* 137 Ohio St.3d 45, 2013-Ohio-4489.]

*Elections—Mandamus—Initiative—Proposed city charter amendment—Ballot summary—County board of elections—R.C. 3505.06—Board summary omits several essential components of proposed amendment—Failure to apprise voters of key elements of amendment invalidates ballot summary— Writ granted in part.*

(No. 2013-1464—Submitted October 1, 2013—Decided October 10, 2013.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1} Relators, Cincinnati for Pension Reform and electors Douglas Robinson and Gary Greenberg (collectively, "CPR") qualified an initiative to amend the Cincinnati City Charter for the November 5, 2013 ballot. However, CPR objects to the ballot language adopted by respondent Hamilton County Board of Elections to describe the proposed amendment. CPR seeks a writ of mandamus to compel the board to adopt new ballot language and to compel respondent Jon Husted, Ohio Secretary of State, to approve the new language approved by the board.

{¶ 2} We find that the board abused its discretion by adopting ballot language that omits two key provisions of the proposed charter amendment and accordingly grant the requested writ in part. We further find that CPR has not established entitlement to a writ against the secretary of state and accordingly deny that request.

**Facts**

**{¶ 3}** CPR sponsored an initiative petition to amend the Cincinnati City Charter by adding a new Article XVII. The proposed amendment contains five sections. The following is a noncomprehensive summary of the proposed amendment.

**{¶ 4}** Section 1 declares that the current model for providing retirement benefits to Cincinnati's municipal employees is "not financially sustainable" and "must be adjusted immediately."

**{¶ 5}** Section 2 announces that future retirement benefits for city employees "must reflect the actual amounts saved by each and contributed for each by the City." Section 2(A) mandates that "[t]he people of Cincinnati, by and through their government, shall not be compelled to contribute more funds to a City employee's retirement benefits than that City employee has contributed to his or her own retirement benefits."

**{¶ 6}** Section 2(B) provides that persons employed by the city at the time the amendment passes may choose between the pension plans described in Sections 2(C) and 2(D), but anyone hired after the date of passage is not eligible to participate in the system described in Section 2(D).

**{¶ 7}** The Section 2(C) pension plan consists of the following:

Effective June 1, 2014, the aggregate retirement benefits paid to current and future City employees may not exceed the aggregate of (1) an employee's individual contributions * * *; (2) the City's contributions * * *; and (3) the return on an investment plan to which employee and employer contributions are made.

**{¶ 8}** The employee can contribute as much as he or she wishes, Section 2(C)(v), but the city cannot contribute an amount greater than 9 percent of the employee's base annual compensation, Section 2(C)(iv).

**{¶ 9}** Thus, Sections 2(A) and 2(C) appear to be an effort to craft a "defined contribution" plan with an employer match. Although Section 2 imposes caps on the employer contribution (the gross employer contribution cannot exceed the gross employee contribution, and in all cases, the employer contribution is capped at 9 percent), the amendment never actually mandates an employer contribution or indicates whether the contribution formula is dollar-for-dollar or calculated at some lower rate.[1]

**{¶ 10}** Section 2(D) preserves the right of current city employees to continue participating in a "defined benefit" plan:

> This defined benefit shall not exceed an annual payment equal to an employee's years of service multiplied by two percent of the average of the employee's five highest years of base compensation. The amount of such payment shall not exceed 60 percent of the average of the employee's five highest years of base compensation. The multiplier applicable to years of service that begin after June 1, 2014 shall not exceed 1.5%.

The defined-benefit plan created under Section 2(D), which does not make employer contributions contingent on employee contributions, appears to conflict with the cap on employer contributions in Section 2(A).

**{¶ 11}** Section 3 imposes limits on cost-of-living adjustments.

---

1. The amendment also fails to explain what will happen to employees hired between the passage date of the amendment (November 5, 2013) and the effective date of the Section 2(C) plan (June 1, 2014). Presumably, those employees would be ineligible for any retirement benefits for up to the first seven months of their employment.

**{¶ 12}** Section 4 imposes an auditing requirement. Section 4(C) mandates:

> If any independent audit demonstrates that insufficient funds will be available to pay forecasted future obligations within ten years from the date of the audit's completion, the City must forthwith create sufficient cost savings or new revenue that, when accumulated over the time between the adverse audit and the projected shortfall, will meet those forecasted future obligations.

**{¶ 13}** Section 5 provides for enforcement of the amendment "to the maximum extent possible." To that end, Section 5(E) vests standing in any Cincinnati resident, "whether injured or not," to bring a civil or equitable action to enforce the amendment, places the burden of proof on the city to demonstrate that it is in compliance, and allows the plaintiff to recover reasonable attorney fees.

**{¶ 14}** On September 3, 2013, Cincinnati City Council enacted Ordinance No. 263-2013, directing the board to submit the proposed charter amendment to the electors at the November 5, 2013 election. A copy of Ordinance No. 263-2013 is attached to the complaint as Exhibit B. The ordinance included proposed ballot language summarizing the amendment.

**{¶ 15}** CPR filed a written objection to city council's proposed ballot language. On September 9, 2013, the board heard arguments from a number of parties regarding the proposed ballot language.

**{¶ 16}** The board reconvened the next evening, September 10, 2013, and approved the following ballot language.

**CHARTER AMENDMENT**

**City of Cincinnati**

**A majority vote is necessary for passage**

An Amendment to the Charter of the City of Cincinnati to Add Provisions Relative to Pension and Retirement Plans for City Employees.

Shall the Charter of the City of Cincinnati be amended to add Article XVII that would:

1. Require the City of Cincinnati to pay forecasted pension obligation shortfalls by creating sufficient new revenues, which may include new or additional taxes and fees, and/or other revenue sources, and/or by implementing sufficient cost savings, which may include cuts to city programs or services, to fund any projected shortfall of the Cincinnati Retirement System which, as determined by an independent financial audit, would result in insufficient funds being available to pay forecasted future obligations of the Cincinnati Retirement System within ten years from the date of the audit's completion;

2. Require current City employees to choose to continue to participate in a defined benefit plan with maximum allowable percentages of salary provided pursuant to retirement benefits of individual employees or enroll in a defined contribution plan under which the aggregate retirement benefits paid by the Cincinnati Retirement System may not exceed the aggregate of an employee's individual contributions, which can be made at any level, and the City of Cincinnati's contributions, which shall not exceed the employee's individual contributions, and shall not exceed nine percent;

3. Provide future employees with only the defined contribution plan described herein;

4. Provide that no past or present City employee shall be entitled to collect retirement benefits while simultaneously earning income from the City or any other political subdivision or government agency or entity;

5. Provide for a potential cost of living adjustment for beneficiaries of the Cincinnati Retirement System not to exceed the increase in a the [sic] consumer price index, but which shall not exceed a simple rate of 3% per annum, which cost of living adjustment may be temporarily suspended when necessary at the discretion of the City of Cincinnati;

6. Provide for enforcement of this amendment to the extent permitted by law and further provide that any Cincinnati resident, whether injured or not, shall have the right to bring a civil or equitable action to enforce this amendment, and be entitled to have their attorneys fees and expenses paid by the City if they prevail?

FOR THE AMENDMENT

AGAINST THE AMENDMENT

{¶ 17} CPR filed the instant action two days later, on September 12, 2013, naming as respondents the Hamilton County Board of Elections and Ohio Secretary of State Jon Husted. The respondents filed answers, as did the American Federation of State, County, and Municipal Employees Ohio Council 8 and Ohio Chapter 1184 (collectively, "AFSCME"), whose motion for permissive intervention as respondents the court granted on September 24, 2013.

**{¶ 18}** The parties submitted briefs to the court in compliance with the accelerated schedule for expedited election cases set forth in S.Ct.Prac.R. 12.08(A)(2). The court has also received and considered two amicus briefs, one from Cincinnati Organized and Dedicated Employees, Inc., and the other from the city of Cincinnati.

**{¶ 19}** This cause is now before the court for consideration of the merits.

### Analysis

#### *Mandamus*

**{¶ 20}** CPR objects both to language the board *added* to the summary and to language the board *omitted*. For a writ of mandamus to issue against the board, CPR must establish a clear legal right to compel the board to revise its ballot language, a corresponding clear legal duty on the part of the board to revise its ballot language, and the lack of an adequate remedy at law. *State ex rel. Allen v. Warren Cty. Bd. of Elections*, 115 Ohio St.3d 186, 2007-Ohio-4752, 874 N.E.2d 507, ¶ 8. CPR must prove these requirements by clear and convincing evidence. *State ex rel. Orange Twp. Bd. of Trustees v. Delaware Cty. Bd. of Elections*, 135 Ohio St.3d 162, 2013-Ohio-36, 985 N.E.2d 441, ¶ 14.

**{¶ 21}** Because of the proximity of the November 5 election, CPR has established that it lacks an adequate remedy in the ordinary course of the law. *State ex rel. Ohio Liberty Council v. Brunner*, 125 Ohio St.3d 315, 2010-Ohio-1845, 928 N.E.2d 410, ¶ 27.

#### *Clear legal right and clear legal duty*

**{¶ 22}** When a local issue qualifies for the ballot, the board of elections may either use the entire text of the proposed charter amendment as ballot language or it may prepare and certify a condensed text so long as the text "properly describe[s]" the issue or amendment. R.C. 3505.06(E). The board must transmit its approved ballot language for local questions to the secretary of state for final approval. R.C. 3501.11(V).

**{¶ 23}** R.C. 3505.06 "serves to inform and protect the voter and presupposes a condensed text which is fair, honest, clear and complete, and from which no essential part of the proposed amendment is omitted." *State ex rel. Minus v. Brown*, 30 Ohio St.2d 75, 81, 283 N.E.2d 131 (1972). The court evaluates proposed ballot language for local issues using the same three guidelines it uses to evaluate ballot language for proposed state-wide constitutional amendments. *State ex rel. Kilby v. Summit Cty. Bd. of Elections*, 133 Ohio St.3d 184, 2012-Ohio-4310, 977 N.E.2d 590, ¶ 19. These guidelines are as follows:

**{¶ 24}** (1) Voters have the right to know what they are being asked to vote upon;

**{¶ 25}** (2) Use of language in the nature of a persuasive argument in favor of or against the issue is prohibited; and

**{¶ 26}** (3) The determinative issue is whether the cumulative effect of the technical defects in the ballot language is harmless or fatal to the validity of the ballot. *State ex rel. Bailey v. Celebrezze*, 67 Ohio St.2d 516, 519, 426 N.E.2d 493 (1981); *Jurcisin v. Cuyahoga Cty. Bd. of Elections*, 35 Ohio St.3d 137, 141-142, 519 N.E.2d 347 (1988).

**{¶ 27}** The respondent board of elections suggests that publication of the full text of the proposed amendment, either in newspapers or at polling places, cures any defect in ballot language. However, the full text of the issue or amendment must always be posted in each polling place if the board chooses to use a condensed text. R.C. 3505.06(E). Therefore, if the court were to adopt the board's theory, it would essentially mean an end to judicial review of ballot language. Rather than adopt such a principle, we turn to a consideration of the specific language added by and omitted by the board.

*Language added to the summary by the board*

**{¶ 28}** CPR's primary objection concerns the summary's treatment of Section 4(C) of the proposed amendment. The full text of Section 4(C) provides:

> If any independent audit demonstrates that insufficient funds will be available to pay forecasted future obligations within ten years from the date of the audit's completion, the City must forthwith create sufficient cost savings or new revenue that, when accumulated over the time between the adverse audit and the projected shortfall, will meet those forecasted future obligations.

**{¶ 29}** The relevant ballot summary approved by the board reads as follows.

> Shall the Charter of the City of Cincinnati be amended to add Article XVII that would:
>
> 1. Require the City of Cincinnati to pay forecasted pension obligation shortfalls by creating sufficient new revenues, *which may include new or additional taxes and fees, and/or other revenue sources*, and/or by implementing sufficient cost savings, *which may include cuts to city programs or services, to fund any projected shortfall* of the Cincinnati Retirement System which, as determined by an independent financial audit, would result in insufficient funds being available to pay forecasted future obligations of the Cincinnati Retirement System within ten years from the date of the audit's completion.

(Emphasis added.)

**{¶ 30}** CPR objects to the inclusion of the italicized language for multiple reasons, among them that the added language unfairly misrepresents the proposed amendment and that it constitutes improper persuasive argument designed to discourage voters from approving the amendment.

*Is the ballot language misleading?*

**{¶ 31}** CPR contends that the board made the ballot language misleading by adding the phrase "*which may include new or additional taxes and fees, and/or other revenue sources*" as a gloss on the words "new revenue" and by expanding on the phrase "cost savings" by adding the words "*which may include cuts to city programs or services, to fund any projected shortfall*." CPR presents two theories as to why this information is misleading.

**{¶ 32}** First, CPR suggests that the expanded text may not be accurate because it conflicts with Section 1(B) of the proposed amendment, which makes it "unlawful for the City to create new revenue or cost savings to fund the pension deficit by raising taxes or fees or cutting city services." But Section 1(B) is purely precatory. It states that taxes and fees "should not be raised" and city services "should not be reduced or jeopardized" in order to fund past or current retirement benefits. Section 1(B) contains no substantive provisions, and certainly none to conflict with the language added by the board of elections.

**{¶ 33}** Alternatively, CPR asserts that the board is misleading voters by enunciating certain means, presumably unpopular ones, by which a shortfall could be overcome, while omitting other possibilities, such as selling assets and bonds or seeking federal and state grant money.

**{¶ 34}** This court has disapproved ballot language on the grounds that it is misleading when the language would lead an average reader to draw a conclusion that is *false*. *See, e.g., Bailey*, 67 Ohio St.2d at 519-520, 426 N.E.2d 493 (use of word "presently" in conjunction with the phrase "at no cost to Ohio taxpayers" was misleading because it "creates the clear impression that, if the amendment is

10

adopted, Ohio taxpayers will be required to bear some of the cost" of implementing the amendment); *State ex rel. Voters First v. Ohio Ballot Bd*., 133 Ohio St.3d 257, 2012-Ohio-4149, 978 N.E.2d 119, ¶ 47 (summary ballot language that the amendment would "[m]andate the General Assembly to appropriate all funds as determined by the Commission" was "inaccurate and prejudicial" because it falsely indicated that the General Assembly had no discretion to refuse a request for funds).

{¶ 35} The language added by the board in this case is not misleading, in the sense of leading the reader to draw a false conclusion. *State ex rel. Commrs. of Sinking Fund v. Brown*, 167 Ohio St. 71, 73, 146 N.E.2d 287 (1957) (where summary made it clear that proposed bonds would be general obligation of the state, alleged overemphasis on a new cigarette tax did not falsely suggest or imply that the debt would be payable solely by cigarette tax).

{¶ 36} CPR is not entitled to a writ of mandamus on that basis.

*Is the language improperly persuasive?*

{¶ 37} In both *Bailey* and *Voters First*, the court was troubled not just by the inaccurate implications of the language, but by the way those false implications were meant to sway the voters' opinions of the measure in a specific direction. The *Bailey* court characterized the language as more than merely inaccurate: "*It is in the nature of an argument against adoption of the amendment*." (Emphasis added.) *Id.,* 67 Ohio St.2d at 520, 426 N.E.2d 493; *see also Voters First* at ¶ 48 ("In essence, the omission in the ballot board's language * * * is in the nature of a persuasive argument against [the amendment's] adoption").

{¶ 38} CPR argues that the language in this case is equally persuasive in nature and hence improper. CPR cites two cases: *Beck v. Cincinnati*, 162 Ohio St. 473, 124 N.E.2d 120 (1955), and *Jurcisin*, 35 Ohio St.3d 137, 519 N.E.2d 347.

11

**{¶ 39}** *Beck* involved a proposed tax levy for operating expenses. In certifying the issue for the ballot, the city council inserted into the caption the words "[i]f levy passes, there will be no city income tax in 1955 or 1956." This court held that the city council exceeded its authority when it inserted the contested language. *Id.* at 475.

**{¶ 40}** According to CPR, *Beck* stands for the proposition that the city council (or board of elections) cannot insert language that is "in the nature of persuasive argument," even if the additional language is factually accurate. But the problem with the language in *Beck* was not that it was argumentative, but that it was an improper *inducement*. By inserting the contested language, the city council promised voters that if they voted for increased property taxes, they could prevent an income-tax increase, an inducement calculated to appeal to a certain segment of the electorate. " 'It is a matter of common knowledge that the majority of electors are not property holders and therefore undoubtedly were persuaded by the unauthorized phrase at issue.' " *Id.* at 476, quoting the trial court decision.

**{¶ 41}** *Beck* is distinguishable for another reason. The issue in *Beck* was the inclusion of additional text in the *caption* of the ballot. The caption is governed by R.C. 3505.06(D), which restricts the permissible language to "a brief title descriptive of the question or issue below it, such as 'Proposed Constitutional Amendment,' " along with a statement of the percentage of affirmative votes necessary for passage. A more accurate understanding of *Beck* would be that when it comes to the caption (as opposed to the summary language, which is governed by R.C. 3505.06(E)), *nothing* is permitted in the way of specifics about the proposal under consideration. *Beck,* 162 Ohio St. at 474, 124 N.E.2d 120 (rejecting the contention that "there is no prohibition against the insertion of additional information in the caption of a ballot"); *see also Alexander v. Toledo*, 168 Ohio St. 495, 156 N.E.2d 315 (1959).

{¶ 42} The second case CPR cites is *Jurcisin,* 35 Ohio St.3d 137, 519 N.E.2d 347. The ballot issue in *Jurcisin* was a proposed charter amendment to create a police review board and an office of professional standards in the office of the director of public safety. This court found nothing improper or defective in the summary ballot language. "The language is not inaccurate, incorrect, or illegal. It is not confusing, misleading, or argumentative. It is not persuasive in nature * * *." *Id*. at 141.

{¶ 43} One of the specific objections in *Jurcisin* was that the summary was misleading because it failed to tell voters that passage of the proposed amendment would require a significant appropriation of city funds for the operation of the new review board. The court held that this was a permissible omission and then went on to observe in dicta that any reference to the need for an appropriation would be improper and in the nature of a persuasive argument in favor of or against the measure. *Id*. at 142.

{¶ 44} CPR quotes *Jurcisin* to support its argument that it is improper to put in explanatory information about the consequences of a proposed measure, even if the information is accurate. If that were a correct reading of *Jurcisin*, the case would be in tension with the court's more recent opinion in *Kilby*, 133 Ohio St.3d 184, 2012-Ohio-4310, 977 N.E.2d 590.

{¶ 45} *Kilby* involved a proposed Akron municipal charter amendment that, among other things, would lengthen the terms of office for members of city council. Kilby filed a protest against the ballot language. According to Kilby, the ballot language amounted to a "sales pitch," "electioneering," and a "persuasive argument in favor of the proposed charter amendment." *Id*. at ¶ 22.

{¶ 46} This court rejected Kilby's objection because even if the language was all those things, it was not *inaccurate*. *Id*. As the ballot summary stated, the amendment *would* eliminate the cost of an extra election and limit pay raises for

council members. The court distinguished *Beck* on the grounds that *Beck* involved a "statement of mere unauthorized speculation." *Id*.

{¶ 47} Based on *Kilby*, intervening respondent AFSCME argues that selective amplification in ballot language is permissible, so long as it does not render the ballot language misleading. AFSCME points to the following language in *Voters First*: ballot language " ' "ought to be free from any misleading tendency, whether of amplification or omission." ' " *Voters First,* 133 Ohio St.3d 257, 2012-Ohio-4149, 978 N.E.2d 119, at ¶ 29, quoting *Markus v. Trumbull Cty. Bd. of Elections*, 22 Ohio St.2d 197, 203, 259 N.E.2d 501 (1970), quoting the trial court's opinion therein.

{¶ 48} CPR is correct that the *Jurcisin* court said it would be improper to include any explanation that passing the measure would require a new appropriation, but CPR is mistaken about the court's reasoning. What the court said was

> [o]mission of a statement that the amendment would require appropriations from the city's budget is not fatal to the language of the summary *because the amendment itself does not make any reference to appropriations.* Inclusion of such language would be in the nature of a persuasive argument in favor of or against an issue.

(Emphasis added.) *Jurcisin,* 35 Ohio St.3d at 142, 519 N.E.2d 347.

{¶ 49} The facts of the present case are closer to those in *Kilby* than *Jurcisin*. The language the board added did not introduce a new subject that was outside the terms of the proposed amendment. And there is nothing factually

14

inaccurate about the descriptive language. For this reason, we deny the writ with respect to the Section 4(C) language.[2]

*Did the board violate R.C. 3505.06 by expanding,*

*rather than condensing, the text?*

{¶ 50} Alternatively, CPR argues that the italicized language *expands* the summary text, in violation of R.C. 3505.06's requirement of a *condensed* text. R.C. 3505.06(E) permits the board of elections to use as ballot language a "condensed text that will properly describe" the issue or question on the ballot. CPR suggests that by adding words not present in the amendment itself, the board expanded, rather than condensed, the text, in violation of the statute. CPR cites no authority to support this argument except to note the use of the word "condensed" in R.C. 3505.06.

{¶ 51} The phrase "condensed text" in R.C. 3505.06(E) refers to a summary of the entire question or issue under consideration. And in this case, there is no dispute that the proposed ballot language (which is six paragraphs long) is a condensation of the full amendment, which runs three full pages. There is no support, in the text of R.C. 3505.06(E) or in this court's jurisprudence, for the proposition that the word count for each subsection of the summary must be smaller than that of the corresponding section in the amendment.

{¶ 52} Apart from the word count, CPR objects to the board's use of language that does not appear in the actual amendment itself. The duty of the board is to ensure that the ballot language it approves does not " 'mislead, deceive, or defraud the voters' " and that the voters know what it is they are being asked to vote upon. *Voters First,* 133 Ohio St.3d 257, 2012-Ohio-4149, 978

---

2. CPR also argues that the board inserted persuasive argument by shifting the order of presentation. In Section 4(C), the phrase "cost savings" appears *before* the phrase "new revenue," but in the ballot language, the order is reversed. Whatever the motive for such a change, CPR has not demonstrated that the order of presentation would even have a persuasive impact, much less that the alteration makes the summary fundamentally unfair.

N.E.2d 119, ¶ 26, quoting *Bailey,* 67 Ohio St.2d at 519, 426 N.E.2d 493. A strict requirement that boards cannot draft ballot language using nouns or verbs that do not appear in the proposed amendment would unduly restrict a board's discretion as it carries out its duties.

{¶ 53} Finally, CPR contends that the board deviated from its statutory responsibilities by drafting language that purports to explain the potential "effects" of the amendment, rather than the actual terms of the amendment. However, the distinction CPR suggests is impossible to sustain. The difference between explaining the provisions of a law and explaining its consequences depends on where one stands on the issue. The language an amendment's proponents may regard as a negative description of the law's consequence could seem to its opponents merely a necessary explanation of the law's meaning.

{¶ 54} Based on the prior decisions of this court, the Hamilton County Board of Elections did not abuse its discretion, and so we deny the writ as to the additional text.

*CPR's challenge to topics omitted by the board*

{¶ 55} As a preliminary matter, AFSCME argues that CPR waived the omission claims by failing to raise them before the board of elections. AFSCME's waiver argument is mistaken as a matter of law.[3]

{¶ 56} R.C. 3513.05 (paragraph 13) permits certain qualified electors to file protests against declarations of *candidacy* with the proper elections officials. R.C. 3513.05 requires election officials to conduct a "hearing" on the protest and provide notice to the protester (and presumably, a right to be heard). A statutory protest is an adequate remedy at law that, if not pursued, will preclude the issuance of an extraordinary writ. *State ex rel. Lippitt v. Cuyahoga Cty. Bd. of*

---

3. The argument also appears at least partly mistaken on the facts. At the board of elections meeting on September 9, 2013, CPR *did* object to the omission of the word "reasonable" from the attorney-fees ballot language in Paragraph 5.

*Elections*, 56 Ohio St.2d 70, 381 N.E.2d 1129 (1978); *Maranze v. Montgomery Cty. Bd. of Elections*, 167 Ohio St. 323, 148 N.E.2d 229 (1958). Therefore, the failure to raise an issue as part of the candidacy protest constitutes a waiver of that issue. *State ex rel. Shumate v. Portage Cty. Bd. of Elections*, 64 Ohio St.3d 12, 15, 591 N.E.2d 1194 (1992).

**{¶ 57}** But AFSCME has identified no comparable statute mandating a hearing to protest ballot language. The cases cited above discuss the importance of a record of the board proceedings, including testimony under oath. The transcripts in the record demonstrate that no such "hearing" occurred before the Hamilton County Board of Elections. And in the present case, a comparison of the ballot language to the full text of the proposed amendment is all the record the court requires. AFSCME's waiver argument is not well taken.

**{¶ 58}** When the board of elections elects to use a summary as ballot language, "any omitted substance of the proposal must not be material, i.e., its absence must not affect the fairness or accuracy of the text." *Voters First,* 133 Ohio St.3d 257, 2012-Ohio-4149, 978 N.E.2d 119, ¶ 30. Summary ballot language must not omit any "essential part" of the proposed amendment. *State ex rel. Minus v. Brown*, 30 Ohio St.2d at 81, 283 N.E.2d 131.

**{¶ 59}** *Voters First* illustrates the principles governing omission challenges to ballot language. *Voters First* involved a proposed constitutional amendment designed to change the manner by which Ohio sets Congressional and state legislative districts by creating a bipartisan commission to oversee the process. However, the ballot language omitted key information voters needed because it did not tell them *who* would select the commission members or what criteria the commission would use to draw new districts, even though the actual amendment spelled out both things. *Id*. at ¶ 34-40. Because the subject matter of the omissions "strikes at the very core of the proposed amendment," *id*. at ¶ 41, this court ordered the Ohio Ballot Board to redraft the ballot language.

{¶ 60} However, we held that it was permissible to omit more peripheral details, such as the name of the commission and the provisions guaranteeing that redistricting would be an open process. *Id*. at ¶ 44. Such omissions did not "prevent[] voters from knowing the substance of the proposal being voted upon or mislead[], deceive[], or defraud[] voters." *Id*.; *see also Kilby*, 133 Ohio St.3d 184, 2012-Ohio-4310, 977 N.E.2d 590, ¶ 24 (summary of amendment to change the length of council members' terms could omit information about which election year the change would go into effect, because that information was "immaterial" to the "critical substance" of the proposed amendment).

{¶ 61} With these principles in mind, we turn to consideration of the omissions cited by CPR.

*The omission of Section 2(A)*

{¶ 62} CPR protests the omission of Section 2(A) of the amendment from the ballot language. Section 2(A) provides that "[t]he people of Cincinnati, by and through their government, shall not be compelled to contribute more funds to a City employee's retirement benefits than that City employee has contributed to his or her own retirement benefits." CPR describes Section 2(A) as an essential provision "designed to protect City taxpayers."

{¶ 63} Section 2(A) merely restates the definition of a defined-contribution plan in Section 2(C), and that information already appears in the summary ballot language. We conclude that Section 2(A) has not been omitted.

{¶ 64} The request for a writ of mandamus in connection with the omission of Section 2(A) language is hereby denied.

*The omission of part of Section 2(C)*

{¶ 65} Section 2(C) sets out the defined-contribution plan that will apply to all city employees hired on or after June 1, 2014, as well as those current employees who select this plan. Section 2(C) provides that participants will receive retirement funds from three sources: the employee's contribution, the

18

city's contribution, and "the return on an investment plan to which employee and employer contributions are made."

**{¶ 66}** The ballot language omits the third source of retirement revenue. As the plan is described in Paragraph 2 of the summary,

> the aggregate retirement benefits paid by the Cincinnati Retirement System may not exceed the aggregate of an employee's individual contributions, which can be made at any level, and the City of Cincinnati's contributions, which shall not exceed the employee's individual contributions, and shall not exceed nine percent.

This language does not just omit critical information; it misrepresents the terms of the new defined-contribution plan. Anyone reading the ballot language alone would reasonably believe that the plan is nothing more than a savings account with a deferred-compensation contribution from the employer. Nothing indicates that the account will even accrue simple interest, much less potentially grow (or shrink) depending on how the investments fare.

**{¶ 67}** By any reasonable measure, the terms of the new pension plan for all future city employees lie at the core of this amendment. By not telling voters that employees can increase or decrease their retirement savings through investments, the ballot language does not afford sufficient information for voters to decide whether this is the plan they wish to adopt. This is comparable to the ballot language in *Voters First* telling voters that a new commission would assume responsibility for redistricting, but not telling voters how the commission members would be selected.

**{¶ 68}** We therefore grant the writ of mandamus in part and order the board of elections to draft new ballot language that reflects the provisions of Section 2(C) of the proposed charter amendment.

*The omission of Section 2(F)*

**{¶ 69}** CPR also characterizes Section 2(F) as an essential taxpayer-protection provision. Section 2(F) provides:

> No employee hired after the date of the Amendment shall maintain a property or contractual right to any retirement funds above and beyond those which he or she has contributed, along with the investment return earned by those funds. City Council and Voters maintain the right to reduce future benefits, as required by this Amendment or otherwise.

**{¶ 70}** Section 2(F) is an essential component of the proposed amendment, for much the same reason as Section 2(A). As presently written, the ballot language creates the impression that an employee hired in the future who contributes money to the pension plan is *guaranteed* some reciprocal contribution by the city and that in the event of future shortfalls, the city may have to seek new revenue or enact cost-saving measures elsewhere to ensure those contributions.[4]

**{¶ 71}** But in fact, under Section 2(F), even the first dollar of city contributions is entirely voluntary, and the city can decide at any time to end its contributions, even retroactively. This would be essential information to both advocates for and opponents of the proposal.

**{¶ 72}** We therefore grant the writ of mandamus in part and order the board of elections to draft new ballot language that reflects the provisions of Section 2(F) of the proposed charter amendment.

---

4. This confusion is evident in the briefing. The city of Cincinnati, in its amicus brief, argues that the amendment would require the city "to fund pension shortfalls before it funds basic services, such as police, fire, and infrastructure projects."

*The omission of part of Section 3*

{¶ 73} Paragraph 5 of the summary informs voters that cost-of-living adjustments are capped at 3 percent per annum and that the city may suspend such increases "when necessary at the discretion of the City." CPR objects to the absence of any reference in the summary to Section 3(C), which prohibits the city from raising taxes or reducing services to fund cost-of-living adjustments.

{¶ 74} A voter reading Paragraph 5 would likely believe that the city has a *choice* as to how to pay future cost-of-living increases if there is a budget shortfall: either through suspending such increases or by raising taxes or reducing services elsewhere, whereas Section 3(C) makes clear that one of those options is prohibited.

{¶ 75} However, this is not core, essential information, simply because the amount of money involved is relatively small compared to the overall impact of the total amendment. This is especially true given the fact that as attrition shifts the workforce from the defined-benefit plan to the defined-contribution plan, no one will receive cost-of-living adjustments anymore. Inevitably, a summary will have to omit some important but nonessential information.

{¶ 76} The request for a writ of mandamus in connection with the omission of Section 3(C) language is hereby denied.

*The omission of part of Section 4*

{¶ 77} Section 4 provides that the city's retirement plan must be audited annually by an independent auditor. CPR notes that the ballot language does not include the requirement that the audit occur annually. "The timing requirement is an indispensable provision," CPR asserts, because "[w]ithout it, all of section 4 would be rendered meaningless, because there would be no requirement for the city to conduct an audit." This argument lacks merit.

{¶ 78} The timing of the audits is not a key element of the proposed amendment. In this case, the "core" of the proposed charter amendment is the

effort to guarantee solvency in the pension fund by changing the manner in which benefits are calculated and by requiring the city to take specified affirmative steps to close any projected deficit in the funds. The *timing* and *frequency* of audits by the city would seem to be a matter of secondary importance. *Voters First,* 133 Ohio St.3d 257, 2012-Ohio-4149, 978 N.E.2d 119, ¶ 44 (guarantees that redistricting process would be open to public view was not core component of proposed amendment).

{¶ 79} CPR argues that Section 4, which creates the duty to cut costs or generate new revenue if an audit forecasts a deficit in the fund, would be rendered meaningless without a requirement that the city commission an audit annually. Apparently, CPR believes that only an independent audit *commissioned by the city* can trigger the duty created by this provision. We read this provision differently.

{¶ 80} The caption to Section 4 mandates that the retirement systems must be audited annually, and Section 4(A) provides for auditing by an independent auditor. Section 4(B) then sets forth the data that must be provided by "[t]he audit specified in Division (A)." However, Section 4(C), the automatic trigger, uses very different language: "If *any* independent audit demonstrates that insufficient funds will be available * * *." (Emphasis added.) Unlike Section 4(B), Section 4(C) does not limit itself to the audit mandated by Section 4(A). So, for example, if a private citizen performed an audit of pension funds based on documents obtained through the Ohio Public Records Act, and that audit projected a ten-year shortfall, under the plain terms of Section 4(C), that private, independent audit would trigger the mandatory provisions. The point here is that because the automatic triggers are not dependent on the city's commissioning the audit, the frequency with which the city is required to commission audits is not essential information.

**{¶ 81}** The request for a writ of mandamus in connection with the omission of Section 4(A) language is hereby denied.

*The omission of part of Section 5*

**{¶ 82}** Finally, CPR cites two omissions from Section 5 that do not affect the fairness or accuracy of the text. Section 5(C) provides that the amendment does not apply to city employees enrolled in a state-employee-retirement system. CPR claims that this omission is intended "to mislead voters into thinking that the Amendment applies to *all* city employees, rather than a much narrower subset of city employees." (Emphasis sic.) But one can safely presume that such employees are aware that they receive their pension benefits from the state, not from the city, and therefore would not be misled into opposing the amendment by incorrectly thinking it would apply to them.

**{¶ 83}** Second, CPR objects to the fact that the summary indicates that litigants shall recover attorney fees without including the qualifier that attorney fees must be reasonable. Practicing attorneys will recognize the significance of the distinction between "attorney fees" and "reasonable attorney fees," but CPR cannot demonstrate that the distinction would have any meaning to the lay public, much less that the omission makes the summary unfair or inaccurate.

**{¶ 84}** The request for a writ of mandamus in connection with the omission of Section 5 language is hereby denied.

*CPR is not entitled to relief against Secretary Husted*

**{¶ 85}** CPR does not dispute Secretary Husted's contention that his only statutory responsibility is to review ballot language for form, not for content. CPR does not contend that a writ must issue against Secretary Husted in order to afford CPR complete relief. We find that no relief is proper against the secretary.

**Conclusion**

**{¶ 86}** Based on the foregoing, CPR has established its entitlement to the requested extraordinary relief in part. We grant a writ of mandamus to compel

the Hamilton County Board of Elections to produce amended ballot language that incorporates Sections 2(C) and 2(F) of the proposed charter amendment. The writ is denied in all other respects.

Writ granted in part
and denied in part.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

PFEIFER, J., dissents and would deny the writ in its entirety.

_____

Langdon Law, L.L.C., David R. Langdon, and Joshua B. Bolinger; and Finney, Stagnaro, Saba & Patterson, L.P.A., and Christopher P. Finney, for relators.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and David T. Stevenson and Colleen M. McCafferty, Assistant Prosecuting Attorneys, for respondent Hamilton County Board of Elections.

Michael DeWine, Attorney General, and Kristopher J. Armstrong and Erin Butcher-Lyden, Assistant Attorneys General, for respondent Jon Husted.

McTigue & McGinnis, L.L.C., Donald J. McTigue, Mark A. McGinnis, and J. Corey Colombo, for intervening respondents Ohio Council 8 and Ohio Chapter 1184, AFSCME.

Minnillo & Jenkins Co., L.P.A., and Christian A. Jenkins, urging denial of the writ for amicus curiae Cincinnati Organized and Dedicated Employees, Inc.

John P. Curp, City Solicitor, and Aaron M. Herzig, Deputy City Solicitor, urging denial of the writ for amicus curiae city of Cincinnati.

_____