NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3852

THE STATE EX REL. MARAS *v*. LAROSE, SECY. OF STATE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Maras v. LaRose,* Slip Opinion No. 2022-Ohio-3852.]

*Mandamus—Elections—R.C. 3505.21—Equal Protection Clauses of the United States and Ohio Constitutions—Rational-basis review—R.C. 3505.21, which governs the process of appointing election observers, does not treat candidates who are not affiliated with a political party differently from party-affiliated candidates, and the statute serves a legitimate government interest by obviating the potential for boards of elections to become overwhelmed with too many election observers—R.C. 3505.21 does not provide election observers with permission to inspect the software, source codes, or hardware installed on automatic vote-tabulating machines, nor does it require poll workers to tabulate votes by hand—Writ denied.*

(No. 2022-1270—Submitted October 26, 2022—Decided October 28, 2022.)

IN MANDAMUS.

————————

**Per Curiam.**

## I. INTRODUCTION

{¶ 1} Relator, Terpsehore P. Maras, is an independent candidate for Ohio Secretary of State on the November 8, 2022 general-election ballot. In this expedited election case, Maras contends that R.C. 3505.21, which governs the appointment of election observers, violates the Equal Protection Clauses of the United States and Ohio Constitutions because it prevents certified independent candidates from appointing election observers to the same extent as political parties. She seeks a writ of mandamus compelling respondent, Ohio Secretary of State Frank LaRose, to allow her to appoint election observers to inspect the counting of votes. She also seeks an order compelling the secretary of state to provide election observers with copies of all software, source codes, and hardware that is installed on any automatic vote-tabulating machine. For the reasons set forth herein, we deny the writ.

## II. BACKGROUND

### A. Statutory provisions governing election observers

{¶ 2} R.C. 3505.21(B) provides for the appointment of election observers to observe the casting and counting of ballots. The statute states:

> At any primary, special, or general election, *any political party supporting candidates to be voted upon at such election and any group of five or more candidates* may appoint to the board of elections or to any of the precincts in the county or city one person, a qualified elector, who shall serve as observer for such party or such candidates during the casting of the ballots and during the counting of the ballots; * * *.

(Emphasis added.) R.C. 3505.21(B).

2

{¶ 3} Any political party or group of candidates appointing observers must notify the board of elections of its appointees and the precincts at which they will serve as observers. R.C. 3505.21(C). This notification must occur at least 11 days before the election, on forms prescribed by the secretary of state. *Id.*

### B. The evidence in the record

{¶ 4} Maras is a general-election candidate for Ohio Secretary of State. She appears on the November 2022 general-election ballot as an independent candidate, rather than one affiliated with a political party.

{¶ 5} As a candidate who is not affiliated with any political party, Maras must join with at least four other candidates in order to appoint election observers. R.C. 3505.21(B). Maras alleges that she contacted at least eight other candidates to join her in appointing observers but that she was unsuccessful in finding four that would do so.

### C. Procedural history

{¶ 6} Maras filed this action on October 12. She alleges that R.C. 3505.21(B) imposes "unconstitutional restrictions on [her] ability to appoint election observers." Maras asserts that the disparate treatment between independent candidates and party-affiliated candidates violates the Equal Protection Clauses of the United States and Ohio Constitutions.

{¶ 7} Maras's complaint also contains numerous allegations concerning what election observers appointed under R.C. 3505.21(B) are allowed to see. She contends that in the past, election observers have not been permitted to sufficiently observe or inspect automated voting and vote-counting machines that are used throughout the state. Because the tabulation process now occurs electronically, rather than by hand, Maras contends that observers cannot meaningfully observe the tabulation process unless they are allowed to inspect all software, source codes, and hardware used by those machines.

**{¶ 8}** Maras seeks a writ of mandamus ordering the secretary of state to allow certified independent candidates to appoint election observers without having to join four other candidates and to allow election observers access to "copies of all software, [source] code[s], and hardware installed on any automatic tabulating machine in use in the precinct in which an observer is appointed so that the software may be meaningfully inspected." Maras further asks that tabulating-machine software be "open or unlocked" so that observers "may inspect [the machines] to the source code level or, alternatively, order poll workers to tally the votes."

**{¶ 9}** We set an expedited schedule for the submission of evidence and merit briefing, ___ Ohio St.3d, ___, 2022-Ohio-3646, ___ N.E.3d ___, and the matter is now fully briefed.

### III. ANALYSIS

### A. Standard of review

**{¶ 10}** To be entitled to a writ of mandamus, Maras must establish by clear and convincing evidence that (1) she has a clear legal right to the requested relief, (2) the respondents have a clear legal duty to perform the requested acts, and (3) she has no adequate remedy in the ordinary course of the law. *See State ex rel. Linnabary v. Husted*, 138 Ohio St.3d 535, 2014-Ohio-1417, 8 N.E.3d 940, ¶ 13. Given the proximity of the election, Maras lacks an adequate remedy in the ordinary course of the law. *See State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, ¶ 21. The remaining elements require us to determine whether the secretary of state engaged in fraud, corruption, or an abuse of discretion or acted in clear disregard of applicable law. *See State ex rel. Husted v. Brunner*, 123 Ohio St.3d 288, 2009-Ohio-5327, 915 N.E.2d 1215, ¶ 9.

**{¶ 11}** Maras does not allege fraud or corruption. Thus, the dispositive issue is whether Secretary LaRose abused his discretion or clearly disregarded

applicable law by not allowing Maras to appoint election observers and not allowing election observers to inspect the automatic-tabulating-machine software.

{¶ 12} A writ of mandamus is an extraordinary remedy, exercised by this court with caution and issued only when the right to relief is clear. *State ex rel. Taylor v. Glasser*, 50 Ohio St.2d 165, 166, 364 N.E.2d 1 (1977). Not only is Maras required to prove clear entitlement to relief, she must also overcome the presumption of constitutionality that is afforded to statutes and demonstrate beyond a reasonable doubt that R.C. 3505.21 is unconstitutional. *See State ex rel. Purdy v. Clermont Cty. Bd. of Elections*, 77 Ohio St.3d 338, 345-346, 673 N.E.2d 1351 (1996).

**B. This court's jurisdiction**

{¶ 13} As a preliminary matter, Secretary LaRose contends that we lack subject-matter jurisdiction over this action because Maras is seeking, in substance, a declaratory judgment that R.C. 3505.21(B) is unconstitutional and a prohibitory injunction forbidding the secretary of state from enforcing the statute. He is mistaken.

{¶ 14} "In general, if the allegations of a complaint for a writ of mandamus indicate that the real objects sought are a declaratory judgment and a *prohibitory* injunction, the complaint does not state a cause of action in mandamus and must be dismissed for want of jurisdiction." (Emphasis added.) *State ex rel. Grendell v. Davidson*, 86 Ohio St.3d 629, 634, 716 N.E.2d 704 (1999). However, if a mandamus complaint seeks a declaratory judgment coupled with a *mandatory* injunction, a writ of mandamus is a proper remedy and this court has jurisdiction over the case. *See State ex rel. Arnett v. Winemiller*, 80 Ohio St.3d 255, 259, 685 N.E.2d 1219 (1997). "The court distinguishes between the two by 'examining the complaint to determine whether it actually seeks to prevent, rather than compel, official action.' " *State ex rel. Gadell-Newton v. Husted*, 153 Ohio St.3d 225, 2018-

Ohio-1854, 103 N.E.3d 809, ¶ 10, quoting *State ex rel. Evans v. Blackwell*, 111 Ohio St.3d 437, 2006-Ohio-5439, 857 N.E.2d 88, ¶ 20.

{¶ 15} The complaint here seeks relief that would compel the secretary of state to perform affirmative acts: allow Maras to appoint election observers to inspect equipment and supervise ballot counting and make available the source codes for the software installed on the automated equipment (or, alternatively, order poll workers to hand-tally the votes). Therefore, Maras does not seek a *prohibitory* injunction.

## C. The equal-protection claim

{¶ 16} Maras argues that the "five candidate rule"—which allows a candidate who is not affiliated with a political party to appoint election observers only if he or she makes the request as part of a group of five candidates—is unconstitutional under the Equal Protection Clauses of the United States and Ohio Constitutions. She argues that we should apply strict scrutiny in evaluating the constitutionality of R.C. 3505.21 because, in her view, "precluding the ability of non-party affiliated candidates to appoint election observers has a real and appreciable impact on and impermissibly interferes with the right to vote." This is so, Maras argues, because election observers are "critical to election integrity."

{¶ 17} We have interpreted the Equal Protection Clause in the Ohio Constitution as being equivalent to the federal Equal Protection Clause. *See McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 7. The first step in an equal-protection analysis is determining the proper standard of review. "When legislation infringes upon a fundamental constitutional right or the rights of a suspect class, strict scrutiny applies." *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 64. "If neither a fundamental right nor a suspect class is involved, a rational-basis test is used." *Id*.

{¶ 18} Maras argues that R.C. 3505.21 is subject to strict scrutiny because it impacts the right to vote. "The right to vote freely for the candidate of one's

choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *see also Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined"). Maras also notes that her rights as a candidate are impacted negatively by R.C. 3505.21. *See Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) ("the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters"). Election observers, she argues, help to protect the rights of voters and candidates by deterring and detecting voter fraud, deterring voter intimidation, and safeguarding voter confidence.

{¶ 19} However, simply because a statute applies to elections does not mean it triggers strict scrutiny for equal-protection purposes. Before strict scrutiny will apply, a legislative classification must "impermissibly interfere[] with the exercise of a fundamental right or operate[] to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). An election statute does not burden the right to vote when there is only "a speculative, future possibility that election irregularities might occur." *Donald J. Trump for President, Inc. v. Boockvar*, 493 F.Supp.3d 331, 419 (W.D.Pa.2020) (applying rational-basis review to state-law requirement that poll watchers be county residents). In this case, R.C. 3505.21 has no direct impact on the fundamental right to vote. *See Werme v. Merrill*, 84 F.3d 479, 485-487 (1st Cir.1996) (rejecting constitutional challenge to a New Hampshire law limiting election inspectors to being members of the two major political parties under rational-basis review). The statute does not regulate the ability to vote or the right to have one's vote tallied. Rather, it regulates who may appoint an election observer. Tellingly, Maras cites no case in which a court has applied strict scrutiny

to a statute limiting the appointment of election observers. Because there is no fundamental right for a candidate to appoint an election observer, *see id.* at 484, strict scrutiny is not appropriate here.

{¶ 20} Secretary LaRose suggests this court employ the *Anderson-Burdick* "sliding scale," *Arizona Green Party v. Reagan*, 838 F.3d 983, 988 (9th Cir.2016), which is a framework often applied to assess the constitutionality of election statutes, *see Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Under the *Anderson-Burdick* framework, "the more severe the burden imposed, the more exacting [the court's] scrutiny; the less severe, the more relaxed [the] scrutiny." *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir.2019). As a practical matter, it is not clear that applying the *Anderson-Burdick* analysis would yield a different result here. *See, e.g.*, *Cook Cty. Republican Party v. Pritzker*, 487 F.Supp.3d 707, 719-720 (N.D.Ill.2020) (challenge to extension of period for curing provisional ballots from 7 to 14 days failed under the *Anderson-Burdick* framework because the plaintiff did not provide any basis for thinking that the additional time would result in election fraud, whereas the state provided a rational justification for the extension). We therefore apply the rational-basis test.

{¶ 21} Under rational-basis review, a statute will be upheld if it is rationally related to a legitimate government purpose. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 66. "Under such a review, a statute will not be invalidated if it is grounded on a reasonable justification, even if its classifications are not precise." *Id.* In order to fail the rational-basis test, a classification adopted by the General Assembly must be "clearly arbitrary and unreasonable." *McCrone*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, at ¶ 9.

{¶ 22} Maras argues that the legislative classification in R.C. 3505.21(B) is between candidates who are not affiliated with a political party and party-affiliated candidates. That is, Maras contends that candidates who are not affiliated with a

8

political party are subject to the "five-candidate rule"—they cannot appoint election observers unless they are among a group of five who agree do so—while party-affiliated candidates are not so restricted. This characterization of the statute is incorrect. Under R.C. 3505.21(B), *candidates* are not treated differently. No single candidate, affiliated or not, may appoint an election observer in any county. Rather, any group of five or more candidates—regardless of party affiliation—may appoint observers. In any county in the state, for example, Maras could join with any four candidates, including local candidates, to appoint observers in that particular county.

{¶ 23} Maras's challenge fails because R.C. 3505.21 passes the rational-basis test. As the secretary of state argues, the statute ensures that appointed election observers represent the interests of *multiple* candidates and are not focused on simply furthering the interests of one particular candidate. In this way, the statute is rationally related to the goal of minimizing disruptions that could occur if too many observers descended on a single polling location.

{¶ 24} Maras counters that the statute cannot pass rational-basis review because it is not rationally related to the state interests posited by Secretary LaRose. She notes that there are only nine statewide elections on the November 8 ballot and that she is the only independent candidate running in any of those races. Because party-affiliated candidates have party-appointed observers to represent them, Maras contends that those candidates "are not inclined to help a non-party affiliated candidate which makes five candidate consent practically unobtainable." And Maras argues that the five-candidate rule has no rational relationship to a state interest in "preventing too many election observers [from] overburdening county boards of elections" because there are not very many statewide candidates.

{¶ 25} Maras's arguments are based on a misreading of the statute. She appears to assume that in order to appoint observers, she must make a joint request with four other *statewide* candidates. But that is not what the statute says. Under

R.C. 3505.21(B), Maras need only be part of a group of five candidates, regardless of the office those candidates are seeking. And as the secretary of state notes, there are 810 other candidates throughout the state—245 of whom are running as independent candidates. Thus, Maras is wrong to characterize the five-candidate rule as an "unobtainable" condition to appointing observers for independent candidates, and her constitutional challenge therefore fails.

{¶ 26} For the same reason, the fact that there are only nine statewide candidates in this November's election does not make R.C. 3505.21(B)'s limitations irrational. R.C. 3505.21(B) applies to any primary, general, or special election and provides for the appointment of an election observer in any precinct of a county or city. The limited number of *statewide* candidates does not mean there are a limited number of total candidates throughout the state, considering the county and district contests that are on the general-election ballot.

{¶ 27} For these reasons, R.C. 3505.21 is rationally related to a legitimate government interest and is therefore constitutional under the Equal Protection Clauses of the United States and Ohio Constitutions.

### D. Access to the tabulating software

{¶ 28} As noted, R.C. 3505.21(B) provides for the appointment of persons to "serve as observer[s] * * * during the counting of the ballots." Maras asserts that the Revised Code has not kept pace with technology. She contends that merely watching the poll workers is inadequate: "Watching the ballots go in a machine and then watching ballots come back out is * * * not a meaningful inspection process for certified observers." According to Maras, this observation cannot be undertaken in any meaningful fashion unless the observers can see and inspect the software, source codes, and hardware installed on any automatic vote-tabulating machine. And she argues that if this court will not order the relief that she requests, then to

make the statute meaningful, poll workers should be required to tally the votes by hand in a way that can be observed.[1]

**{¶ 29}** However, Maras does not identify any clear statutory right to the relief she seeks. "It is axiomatic that in mandamus proceedings, the creation of the legal duty that a relator seeks to enforce is the distinct function of the *legislative branch of government*, and courts are not authorized to create the legal duty enforceable in mandamus." (Emphasis sic.) *State ex rel. Pipoly v. State Teachers Retirement Sys.*, 95 Ohio St.3d 327, 2002-Ohio-2219, 767 N.E.2d 719, ¶ 18. There is nothing in R.C. 3505.21 that permits or requires the inspection of the software, source codes, or hardware that is installed in automatic vote-tabulating machines. Likewise, the Revised Code does not command poll workers to hand-tally the votes in lieu of relying on automatic tabulation. We therefore find no basis for a writ of mandamus to issue.

### IV. CONCLUSION

**{¶ 30}** For the reasons discussed herein, we deny the writ of mandamus.

Writ denied.

O'CONNOR, C.J., and DONNELLY, STEWART, and BRUNNER, JJ., concur.

KENNEDY, FISCHER, and DEWINE, JJ., concur in judgment only.

_____

1. The secretary of state disputes Maras's characterization of the public's ability to observe tabulating by the automated equipment. According to the secretary of state, automatic vote-tabulating machines must be tested, certified by the federal Election Assistance Commission, and meet standards of functionality, accessibility, and security. *See* R.C. 3506.05(H)(4)(a). Testing reports are available for public review. *See* U.S. Election Assistance Commission, *Certified Voting Systems*, available at https://www.eac.gov/voting-equipment/certified-voting-systems (accessed Oct. 27, 2022) [perma.cc/H3SA-7DJJ]. The equipment must then be forwarded to the bipartisan Board of Voting Machine Examiners, which conducts its own tests at meetings that are open to the public. *See* R.C. 3506.05(B). Boards of elections perform tests before and after each election, ensuring the accuracy of the equipment; boards give public notice of the time and place of testing. *See* R.C. 3506.14(B). Finally, automatic vote-tabulating machines are subject to postelection audit under R.C. 3505.331, in which boards of elections audit at least three contested races and at least five percent of the total number of votes cast in those races.

Mendenhall Law Group, Warner Mendenhall, and John Pfleiderer, for relator.

Dave Yost, Attorney General, and Ann Yackshaw, Julie M. Pfeiffer, and Allison D. Daniel, Assistant Attorneys General, for respondent.

_____