THE STATE, EX REL. MINUS ET AL., *v.* BROWN,
SECRETARY OF STATE.

[Cite as State, ex rel. Minus, v. Brown (1972),
30 Ohio St. 2d 75.]

(No. 72-293—Decided April 28, 1972.)

*Messrs. Clayman, Jaffy & Taylor, Mr. Stewart R. Jaffy, Mr. Charles E. Taylor* and *Mr. Jon M. Cope,* for relators.

*Mr. William J. Brown,* attorney general, *Mr. Donald J. Guittar, Mr. Walter E. Carson* and *Mr. Thomas P. Hayes,* for respondent.

O'NEILL, C. J. It is stipulated that Amended Substitute Senate Joint Resolution No. 3 was adopted by the

78

General Assembly *only 42 days preceding the date of the election.*

R. C. 3505.01 states, in part:

"*\* \* \* On the seventy-fifth day* before a special election to be held on the first Tuesday after the first Monday in May designated by the General Assembly *for the purpose of submitting to the voters of the state constitutional amendments proposed by the General Assembly, the Secretary of State shall* certify to the board of elections of each county *the forms of the official ballots to be used at such election.*" (Emphasis added.)

R. C. 3509.01 provides, in part:

"The board of elections of each county shall provide absent voter's ballots for use at every \* \* \* special election \* \* \* for the purpose of submitting constitutional amendments proposed by the General Assembly to the voters of the state."

R. C. 3509.01 provides further:

"Absent voter's ballots provided for use at a \* \* \* special election \* \* \* for the purpose of submitting constitutional amendments proposed by the General Assembly to the voters of the state, *shall include only* such questions, issues, and candidacies as have been lawfully ordered submitted to the electors voting at such election *at least seventy-five days prior to the day of the election.*" (Emphasis added.)

The purpose of those statutes is, *inter alia,* to insure that absent voters are not disenfranchised. It was conceded in oral argument and by letter from counsel that some absent voters, especially servicemen, were disenfranchised, *i. e.,* the package of ballots which they received did not include a ballot to be used in voting on the proposed constitutional amendment.

Another purpose of those statutes is to insure that the electorate has ample time to study, review and discuss among themselves the merits of proposed constitutional amendments. In addition, when important and far-reaching constitutional amendments are proposed, those statutes as-

sure that proponents and opponents have sufficient time to organize state-wide committees and campaigns to inform the voter and to make a proper effort to influence him to support their position. Included in this is the necessity for time to raise the money necessary to communicate with all the voters of the state. Likewise, those statutes seek to insure that sufficient time exists to litigate the validity or constitutionality of the proposed amendments and the method of conducting the election on the proposed amendments.

*The instant case is an illustration of the problems that arise when the General Assembly fails to follow the law.*

By its delay, the General Assembly made it impossible for respondent to fulfill his duty under R. C. 3505.01. This delay caused the local boards of elections to illegally disenfranchise some absent voters, mostly servicemen. It is the clear legal duty of respondent to certify the form of the ballot to the local boards of elections at least 75 days in advance of the special election and the duty of the local boards of elections to provide absentee ballots to absent voters who apply for them 60 days in advance of the special election.

It is stipulated further that during the week of March 26, 1972, there was no publication in Paulding County's only weekly newspaper. While the reason for this omission is not known, the delay of the General Assembly so limited the time period between adopting the resolution and the beginning of the constitutionally necessary mandatory publication that any opportunity for discovering that error was almost eliminated.

The significance of such publication is especially pertinent when it is understood that the *complete text* of the proposed constitutional amendment is not stated on the ballot. The purpose of such publication is to inform the electorate of what, in fact, will become the organic law of this state if adopted.

A proposal to amend the Constitution is not an inherent legislative prerogative—it "is the exercise of a special

power granted to the General Assembly, which must be strictly complied with." *Leach* v. *Brown* (1957), 167 Ohio St. 1, 5, 145 N. E. 2d 525.

Under R. C. 3505.06 respondent has the duty to prepare "a condensed text that will properly describe the question, issue, or amendment" to be voted upon. Undertaking performance of that duty, respondent "condensed" the text of the proposed amendment[2] in the following sentence:

"Shall Section 6 of Article XV of the Constitution of Ohio be amended to authorize a state lottery, the net proceeds of which shall be paid into the general revenue fund of the state?"

The proposed amendment, on its face, appears to authorize a lottery which will be conducted solely by the state. However, the language of the proposed amendment does permit the General Assembly to authorize purely private enterprise to conduct the sale of rights to participate in and to award prizes by drawings in a state lottery.

The proposed amendment reads, in part:

"* * * the General Assembly may authorize the conduct of state lotteries restricted to the selling [by whom?] of rights to participate therein and the awarding of prizes by drawings when the entire net proceeds [after expenses] of any such lottery are paid into the general revenue fund of the state." (Amended Substitute Senate Joint Resolution No. 3.) Had the word "operated" been inserted after the word "state" and before the word "lotteries," the proposed amendment would not permit such construction. Without that additional word, this court can only discern the meaning of the proposed amendment from the *language actually used.* Clearly, that language would permit the General Assembly to authorize private enterprise to conduct lotteries by selling rights to participate in that lottery and by conducting drawings.

The basic premise of R. C. 3505.06 is that the electorate have the right to know what it is that they are being

---

[2]See Footnote 1, page 76.

asked to vote upon. See *State, ex rel. Burton, Pros. Atty.,* v. *Greater Portsmouth Growth Corp.,* 7 Ohio St. 2d 34, 37, 218 N. E. 2d 446; *Markus* v. *Bd. of Elections* (1970), 22 Ohio St. 2d 197, 259 N. E. 2d 501. R. C. 3505.06 serves to inform and protect the voter and presupposes a condensed text which is fair, honest, clear and complete, and from which no essential part of the proposed amendment is omitted

Where, in a mandamus action instituted in the Supreme Court, a substantial constitutional question involving a state-wide special election on a proposed constitutional amendment is presented, and where the relator has acted timely and in good faith, and where the court finds that because of delay by the General Assembly in adopting the resolution proposing the constitutional amendment it is impossible for the Secretary of State to substantially comply with the provisions of R. C. 3505.01, and where the court finds further that because of such delay it is impossible for the county boards of elections to substantially comply with R. C. 3509.01; then, upon such findings by the court, it becomes the clear legal duty of the Secretary of State to strike such proposed constitutional amendment from the ballot, and this court will exercise its jurisdiction and allow a writ of mandamus. *State, ex rel. Foreman,* v. *Brown* (1967), 10 Ohio St. 2d 139, 226 N. E. 2d 116.

This court finds that there is not substantial compliance with the constitutional amending procedure. Therefore, this court orders that the respondent strike issue Number One from the ballot; that he not tabulate any of the votes on that issue; and that respondent direct all the county boards of elections to strike issue Number One from the ballot and direct them not to tabulate any of the votes on this issue.

For the foregoing reasons, the writ is allowed.

*Writ allowed.*

SCHNEIDER, HERBERT, CORRIGAN, STERN and LEACH, JJ., concur.

Brown, J., dissenting. I, unlike the majority, believe that there was substantial compliance with the constitutional amending procedure, and accordingly, that Issue 1 should remain on the ballot.

The following language appears in *State, ex rel. Foreman,* v. *Brown* (1967), 10 Ohio St. 2d 139, 151, relied upon by the majority:

"As stated in the unanimous *per curiam* opinion in *Moore* v. *Thompson* (1954), 161 Ohio St. 339, 119 N. E. 2d 283:

" 'Strictly speaking, all provisions of the election laws are mandatory in the sense that they impose the duty of obedience upon those who come within their purview, but irregularities, which were not caused by fraud and which have not interferred with a full and fair expression of the voters' choice, should not effect a disenfranchisement of the voters.' "

There is nothing to indicate that any of the procedural variances that are now being complained about were caused by fraud; and there is nothing now to indicate that they will interfere with a full and fair expression of the voters' choice. In such an instance, they should not prevent submission of Issue 1 to the voters.