[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Action for Hous. Now v. Hamilton Cty. Bd. of Elections*, Slip Opinion No. 2021-Ohio-1038.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-1038

THE STATE EX REL. CINCINNATI ACTION FOR HOUSING NOW ET AL. *v.* HAMILTON COUNTY BOARD OF ELECTIONS ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Action for Hous. Now v. Hamilton Cty. Bd. of Elections*, Slip Opinion No. 2021-Ohio-1038.]**

*Elections—Mandamus—Writ of mandamus sought to compel county board of elections, secretary of state, and city council to change ballot language regarding proposed city charter amendment on the May 4, 2021 primary-election ballot—Ballot language stating that two funding sources for proposal are prohibited by state law are inappropriately argumentative because they are legal opinions on questions that the proposed amendment does not address—Writ granted in part and denied in part.*

(No. 2021-0312—Submitted March 23, 2021—Decided March 30, 2021.)

IN MANDAMUS.

_____

**Per Curiam.**

{¶ 1} At issue in this case is whether ballot language for a proposed amendment to the Cincinnati City Charter fairly and accurately presents the proposed amendment to the city's electors. Proponents of the amendment seek a writ of mandamus to compel changes to the ballot language. We grant the writ in part and deny it in part.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} Relators, Cincinnati Action for Housing Now and four Cincinnati electors,[1] seek to amend the Cincinnati City Charter to require the city to provide funding for affordable housing and neighborhood stabilization. Their proposal would establish an "Affordable Housing Trust Fund" and an oversight board to control and manage the fund. It also specifies possible funding sources, would require the city to appropriate at least $50 million to the fund annually, and establishes rules for the use of the fund.

{¶ 3} A city charter may be amended only with the approval of the city's electors. Ohio Constitution, Article XVIII, Section 9. Relators obtained a sufficient number of valid signatures on a petition calling for submission of the proposed amendment for a vote. As required under Ohio Constitution, Article XVIII, Sections 8 and 9, respondent Cincinnati City Council ("city council") passed an ordinance for the submission of the proposal to the electorate on the May 4, 2021 ballot. The ordinance included language for use on the ballot summarizing the proposed amendment. City council passed the summary language over the objection of relators' counsel, who had identified and communicated to city council several ways in which relators believed that the summary was deficient.

{¶ 4} R.C. 3505.06(E) authorized respondent Hamilton County Board of Elections ("the board") to prepare and certify "condensed text" that "properly

---

1. The individual relators/electors are Fannie Johnson, Joshua Wesley Spring, Margaret Anne Fox, and Michael W. Volmer.

2

describe[s]" the proposal for use on the ballot. Although relators' counsel objected once again to the ballot language, the board certified ballot language that is nearly identical to the summary adopted by city council. Respondent Secretary of State Frank LaRose approved that ballot language on March 9, 2021, over the objection of relators' counsel. *See* R.C. 3501.05(J) and 3501.11(V).

{¶ 5} On March 11, relators filed with this court an original action in mandamus naming the board, its members,[2] Secretary of State LaRose, and city council as respondents. Relators contend that the language certified by the board and approved by the secretary of state does not fairly and accurately present the proposed amendment. They seek to compel the board and the secretary of state to prepare, certify, and approve new ballot language that fairly and accurately presents the proposed amendment.

## II. APPLICABLE LAW AND ANALYSIS

### A. Mandamus standard and lack of an adequate remedy

{¶ 6} To be entitled to a writ of mandamus, relators must prove by clear and convincing evidence a clear legal right to the requested relief, a clear legal duty on the part of respondents to provide it, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Waters v. Spaeth*, 131 Ohio St.3d 55, 2012-Ohio-69, 960 N.E.2d 452, ¶ 6. To establish a clear legal right to the requested relief and a clear legal duty of respondents, relators must show that respondents abused their discretion or clearly disregarded the law in preparing, certifying, or approving the ballot language. *State ex rel. Kilby v. Summit Cty. Bd. of Elections*, 133 Ohio St.3d 184, 2012-Ohio-4310, 977 N.E.2d 590, ¶ 8. Given the proximity of the May 4 election, we hold that relators lack an adequate remedy in the ordinary course of the law. *See State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, ¶ 21.

---

2. The board members are Gwen L. McFarlin, Alex M. Triantafilou, Joseph L. Mallory, and Charles H. Gerhardt III.

**B. Ballot language certified by the board**

{¶ 7} "When a local issue qualifies for the ballot, the board of elections may either use the entire text of the proposed charter amendment as ballot language or it may prepare and certify a condensed text so long as the text 'properly describe[s]' the issue or amendment." (Brackets sic.) *Id*. at ¶ 22, quoting R.C. 3505.06(E). Once a board of elections certifies ballot language, it must transmit the language to the secretary of state for final approval. R.C. 3501.11(V).

{¶ 8} Ballot language "must fairly and accurately present the question or issue to be decided in order to assure a free, intelligent and informed vote by the average citizen affected." *Markus v. Trumbull Cty. Bd. of Elections*, 22 Ohio St.2d 197, 259 N.E.2d 501 (1970), paragraph four of the syllabus. To satisfy R.C. 3505.06(E), ballot language must be "fair, honest, clear and complete" and "no essential part of the proposed amendment" may be omitted. *State ex rel. Minus v. Brown*, 30 Ohio St.2d 75, 81, 283 N.E.2d 131 (1972). When assessing ballot language, this court asks three questions: (1) Does the text tell voters what they are being asked to vote upon?, *Cincinnati for Pension Reform* at ¶ 24, (2) Does it impermissibly use language that amounts to a persuasive argument for or against the measure?, *id*. at ¶ 25, and (3) If there are technical defects in the text, is the cumulative effect of those defects harmless?, *id*. at ¶ 26.

{¶ 9} Relators argue that the ballot language certified by the board and approved by the secretary of state violates R.C. 3505.06(E) in several ways, by either impermissibly adding to the proposed amendment or omitting its material details. As a preliminary matter, the board suggests that we need not address the alleged material omissions because the proposed ballot language on relators' own petition signed by electors omitted the same information relators now say should be included. The board argues that it did not abuse its discretion or disregard the law "by opting for the more detailed ballot language proffered" by city council.

{¶ 10} The board shows that it misapprehends its role by suggesting that it simply chose between the two summaries. Relators and city council were free to suggest ballot language, but R.C. 3505.06(E) provides for the use of ballot language "as prepared and certified * * * by the board." Regardless of what language was proposed to the board, the board alone had the legal duty to prepare the language. We therefore must examine whether the board complied with R.C. 3505.06(E) and we will address relators' arguments.

*1. Language regarding the city's priorities for appropriation of funds*

{¶ 11} The proposed charter amendment would require city council to appropriate at least $50 million annually to the trust fund. The ballot language states that "[t]he mandatory $50 million annual appropriation shall take priority over other funding needs of the City and could require the City to reduce City services and infrastructure projects by as much as $50 million annually compared to current City expenditures for general operating and capital projects."

{¶ 12} Relators argue that this language is misleading because, according to them, the proposed amendment would not prioritize affordable housing over city services and infrastructure projects, affect city council's authority to fund city services and infrastructure projects, or require reductions in funding. We considered similar arguments regarding the use of explanatory text in ballot proposals in *Cincinnati for Pension Reform*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, at ¶ 28-36. We concluded that explanatory text that invites voters to make inferences is misleading only if it "would lead an average reader to draw a conclusion that is *false*." (Emphasis sic.) *Id*. at ¶ 34.

{¶ 13} Relators have not shown that the language noted above regarding the city's prioritization of appropriations to the fund would lead voters to false conclusions. To start, the statement indicating that appropriations to the fund would have priority over funding for city services and infrastructure projects is accurate. The proposal would amend the city charter—a document that "limits, governs, and

controls the council very much the same as the Constitution limits, governs, and controls the General Assembly," *Bauman v. State*, 122 Ohio St. 269, 270, 171 N.E. 336 (1930). The measure would constrain city council in its performance of its duties. If the proposed amendment passes, city council will need to appropriate money first to the fund before it appropriates any money for city services and projects for which funding is not mandated under the city charter.

{¶ 14} Relators' remaining arguments that the appropriation-priority ballot language is misleading rest on their misreading of the text. They argue that the language falsely states that the proposed amendment would alter city council's "authority" to provide funding for city services and infrastructure projects. But the language does not involve city council's *authority to fund city services and infrastructure projects*; it speaks only to its *ability to fund other things* if $50 million is earmarked for affordable housing. And relators incorrectly contend that the language falsely states that the proposed amendment would "mandate" a reduction in city services and infrastructure spending. The language states only that the proposal "could require" such reductions. The language therefore is not misleading.

{¶ 15} Relators also argue that the appropriation-priority language is argumentative because it speculates about how the amendment might negatively impact the city. In *Cincinnati for Pension Reform*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, at ¶ 49, we approved of added ballot text that explained the consequences of a proposed measure because the text "did not introduce a new subject that was outside the terms of the proposed amendment * * * [a]nd there [wa]s nothing factually inaccurate about the descriptive language." The same can be said of the ballot language here. The proposed amendment addresses the appropriation of funds, so it is fair for the ballot language to also address that topic. *See id*. at ¶ 48-49. And again, the ballot language is not inaccurate.

{¶ 16} Relators nevertheless rely on *Beck v. Cincinnati*, 162 Ohio St. 473, 124 N.E.2d 120 (1955), to argue that the ballot language is argumentative. In *Beck*, language was added to the caption of a proposed tax levy promising that if the levy were to pass, there would be no city income tax for two years. *Id*. at 474. This court invalidated the language because the added language represented an unenforceable promise designed to induce support for the levy. *Id*. at 475-476.

{¶ 17} *Beck* is distinguishable from the facts of this case for the same reason that it was distinguishable from those in *Cincinnati for Pension Reform*: "[T]he problem with the language in *Beck* was not that it was argumentative, but that it was an improper *inducement*." (Emphasis sic.) *Cincinnati for Pension Reform* at ¶ 40. The language at issue here, in contrast to the language in *Beck*, does not promise (or threaten) future action; it simply explains how the proposed amendment could affect future city budgets. And the issue in *Beck* was the inclusion of text in a ballot caption, not ballot language. *Cincinnati for Pension Reform* at ¶ 41; *Beck* at 474. "A more accurate understanding of *Beck* would be that when it comes to the caption (as opposed to the summary language, which is governed by R.C. 3505.06(E)), nothing is permitted in the way of specifics about the proposal under consideration." *Cincinnati for Pension Reform* at ¶ 41.

{¶ 18} We deny relators' claim for a writ of mandamus to the extent that their complaint challenges the ballot language addressed in this section of this opinion because that text fairly and accurately explains the proposed amendment's possible impact on funding for city services and infrastructure.

*2. Language regarding funding dedicated to essential city services and infrastructure*

{¶ 19} The first sentence of the ballot summary states:

Shall the Charter of the City of Cincinnati be amended to require a permanent, annual contribution of fifty million dollars

($50,000,000) of City funds to a new restricted fund for housing that is affordable to persons with low incomes and for related purposes *using funding sources otherwise dedicated to providing for essential City services and public infrastructure needs* * * *.

(Emphasis added.) Relators argue that the language emphasized above is misleading and argumentative.

{¶ 20} We conclude that "the average citizen," *Markus*, 22 Ohio St.2d 197, 259 N.E.2d 501, at paragraph four of the syllabus, would understand the disputed text to mean that the amendment would require the city to appropriate up to $50 million from sources that currently are used to fund essential city services and infrastructure projects. Indeed, city council and several amici curiae urging denial of the writ argue that much of the $50 million funding for the trust fund would have to come from the city's general-operating and capital funds. And they further argue that appropriations for essential services and infrastructure projects currently come from the general-operating and capital funds. Although relators argue that it is speculative to suggest that allocating $50 million to the affordable-housing fund each year will require cuts in other city endeavors, they do not dispute the basic premise of the ballot language—that the trust fund would dip into the bucket of funds that provides for essential city services and public infrastructure.

{¶ 21} As discussed above, the amendment would require the city to appropriate money to the trust fund before providing funds for other services and needs. We conclude that the text regarding funding sources dedicated to essential city services and infrastructure fairly and accurately describes that reality and we therefore deny the writ to the extent that it challenges the ballot language addressed in this section of this opinion.

*3. Lack of explanation of city council's role in appointing members to the trust-fund board*

{¶ 22} Relators next argue that the ballot language is misleading because it does not explain city council's role in appointing members to the trust-fund board. Under the terms of the proposal, the trust-fund board would consist of 11 members, and the right to nominate the board members would be divided among four private organizations and city council's president pro tem. The proposal provides that "City Council will appoint all nominated members to the Board" and that "Council shall confirm all nominations for appointment at the next meeting of Council."

{¶ 23} Relators complain that the ballot language mischaracterizes the board-member-selection process by stating only that the fund would be "administered by an unelected volunteer board" and that it "will be controlled and managed by a board that will consist of eleven private citizens, nine of whom are selected by affordable housing and low income service organizations and two of whom are selected by the City Council President Pro Tem." Relators argue that the ballot language "omits the critical role played by the City Council in selecting the members" of the trust-fund board. They rely on our decision in *State ex rel. Voters First v. Ohio Ballot Bd.*, 133 Ohio St.3d 257, 2012-Ohio-4149, 978 N.E.2d 119, ¶ 31-37, in which we held that ballot language in that case was invalid to the extent that it failed to explain the selection process for members of a commission that would be created by the ballot measure at issue.

{¶ 24} When a board of elections approves ballot language, "any omitted substance of the proposal must not be material, i.e., its absence must not affect the fairness or accuracy of the text." *Id*. at ¶ 30. A board must not omit from ballot language an "essential part" of the proposed amendment. *Minus*, 30 Ohio St.2d at 81, 283 N.E.2d 131.

{¶ 25} Relators have not shown that city council's role in the appointment process is an essential part of the proposed amendment. Contrary to relators'

argument, city council would not have a significant role in deciding who will serve as members of the trust-fund board. Even if city council were to have the authority to reject nominees, the amendment still would not give it the right to select individuals for service on the board. This case is distinguishable from *Voters First*, in which the ballot language omitted any explanation of who would appoint individuals to the proposed commission. *Voters First* at ¶ 34, 37.

{¶ 26} Relators also argue that the use of the word "unelected" to describe the trust-fund board is argumentative. But as already discussed, if ballot language is factually accurate and addresses a subject that is in the proposed amendment itself, it should not be deemed argumentative. *Cincinnati for Pension Reform*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, at ¶ 49. We reject relators' argument and deny the writ regarding this language because under the terms of the proposed amendment, the trust fund-board would, in fact, be unelected.

*4. Language regarding sources of funds*

{¶ 27} Relators also challenge several aspects of the following ballot language:

> City Council shall appropriate no less than $50 million into the fund every fiscal year beginning July 1, 2021, to be paid from (1) the City's general operating or capital funds; (2) revenue from the lease or sale of the Cincinnati Southern Railway, *which appropriation is prohibited by state law*; (3) a proposed fee on developers of all commercial and some residential projects; *or* (4) a personal income tax on the award of stock options in publicly traded companies, *which tax is currently prohibited by state law*.

(Emphasis added.)

a

{¶ 28} The proposed amendment would require city council to appropriate money into the fund "from among" several sources. Relators argue that the ballot language regarding those funding sources will mislead voters by suggesting that funding will be drawn from *all*—and not merely "from among"—the potential sources listed in the proposal. But the use of the disjunctive word "or" plainly indicates that funding need not be drawn from each of the listed sources. *See In re Estate of Centorbi*, 129 Ohio St.3d 78, 2011-Ohio-2267, 950 N.E.2d 505, ¶ 18 ("use of the word 'or,' a disjunctive term, signifies the presence of alternatives"). We reject relators' argument that this text is misleading.

b

{¶ 29} Relators next argue that this ballot language is misleading because it omits a fifth potential funding source—namely, an increase in the municipal-income-tax rate if an increase is approved by Cincinnati voters. In support, relators refer to the following language in the proposed amendment: "Nothing herein shall be construed to permit the council to raise revenue for purposes of this Article through an increase in the rate of the income tax unless the issue is first submitted to a vote of the electorate." But that language would not establish a funding source; it would *prohibit* one absent future voter approval. We reject relators' argument because the ballot text is not misleading.

c

{¶ 30} Relators also argue that this ballot language is argumentative because it states that use of two of the proposed funding sources—revenue from the lease or sale of the Cincinnati Southern Railway and a personal income tax on stock-option income—is prohibited by state law. The proposed amendment itself does not address whether using these funding sources would be legal.

{¶ 31} We hold that the statements saying that two of the funding sources are prohibited by state law are inappropriately argumentative because they are legal

opinions on questions that the proposed amendment does not address. *See Cincinnati for Pension Reform*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, at ¶ 49 (refusing to grant a writ of mandamus regarding explanatory text because it was *factually* accurate and addressed a subject that was in the proposed amendment). In its brief, city council attempts to justify the added text by explaining why it believes that Ohio law prohibits using the two funding sources. But arguments challenging the validity of the proposal are premature when made before the amendment has been approved by the electorate. *Kilby*, 133 Ohio St.3d 184, 2012-Ohio-4310, 977 N.E.2d 590, at ¶ 12. It would be inappropriate for this court to render an advisory opinion on the legality of relators' proposal, particularly in the context of this expedited election case. We grant the writ regarding this language.

### 5. *Language regarding purposes of the proposed amendment*

{¶ 32} In their final argument, relators contend that the ballot language is misleading and incomplete because the opening sentence states only that the proposal would establish "a new restricted fund for housing that is affordable to persons with low incomes *and for related purposes*." (Emphasis added.) They argue that those additional purposes—namely, "neighborhood stabilization," "housing investment to prevent displacement," and "leverag[ing] additional outside resources"—are material aspects of the proposal that need to be expressly mentioned on the ballot.

{¶ 33} Relators have not shown that stating these specific purposes on the ballot is essential for an average voter to understand the substance of the proposed amendment. *See Markus*, 22 Ohio St.2d 197, 259 N.E.2d 501, at paragraph four of the syllabus. The nature of a summary requires the omission of "some important but nonessential information." *Cincinnati for Pension Reform* at ¶ 75. The language in the opening paragraph of the ballot concisely explains the general purpose of the proposal, and in a later paragraph the summary states that "the fund can be allocated to new construction, renovation of vacant property, renovation of

existing affordable units, operation costs of affordable housing, and direct services." The text effectively informs voters about the purposes of the proposed charter amendment.

### C. Clear legal duty of city council and/or the secretary of state

{¶ 34} Mandamus is an appropriate remedy to compel a board of elections to amend local-issue ballot language to comply with R.C. 3505.06. *State ex rel. Walker v. LaRose*, ___ Ohio St.3d ___, 2021-Ohio-825, ___ N.E.3d ___, ¶ 16. Again, for the reasons discussed above, the board has a clear legal duty under R.C. 3505.06(E) to eliminate from the ballot language any statements concerning the legality of using certain funding sources. Relators, however, have not shown that city council or the secretary of state has a similar duty.

{¶ 35} Relators do not even allege that city council has a duty to do anything about the ballot language. Relators therefore have not stated a claim against city council.

{¶ 36} As for the secretary of state, relators point to R.C. 3519.21, which provides that in preparing "a ballot title," the secretary of state "shall give a true and impartial statement of the measure[] in such language that the ballot title shall not be likely to create prejudice for or against the measure." But because R.C. 3519.21 deals with ballot titles, not ballot language, it has no application in this case.

{¶ 37} Relators also argue that the secretary of state has a duty under R.C. 3501.05(J) to give "final approval" of ballot language prepared and certified by a board of elections. Relators argue that R.C. 3501.05(J) requires the secretary of state to substantively review local-issue ballot language. But even if that is true, relators are not trying to compel the secretary to conduct a substantive review of the ballot language. They seek to compel the preparation of valid ballot language. That duty belongs only to the board. Relators therefore are not entitled to relief against the secretary of state.

### D. City council's unclean-hands defense

{¶ 38} City council argues that relators' claims should be denied under the unclean-hands doctrine because the petition prepared and circulated by relators allegedly failed to accurately inform petition-signers about critical details of the proposed amendment. We need not consider this defense because relators are not entitled to a writ of mandamus against city council.

### E. Court costs and attorney fees

{¶ 39} Relators ask for an assessment of court costs against respondents and an award of attorney fees and expenses. Relators have not shown that they are entitled to an assessment of court costs, *see* S.Ct.Prac.R. 18.05(A)(2)(d), or an award of attorney fees and expenses.

{¶ 40} In original actions filed in this court, costs are to be assessed as provided in S.Ct.Prac.R. 18.05(A)(2). But "the general rule is that absent a statute allowing attorney fees as costs, the prevailing party is not entitled to an award of attorney fees unless the party against whom the fees are taxed acted in bad faith." *State ex rel. Dellick v. Sherlock*, 100 Ohio St.3d 77, 2003-Ohio-5058, 796 N.E.2d 897, ¶ 55. Relators have provided no evidence that the board acted in bad faith. We deny relators' request for an award of attorney fees and expenses.

### III. CONCLUSION

{¶ 41} Relators have not shown that city council or the secretary of state has a clear legal duty to provide the relief they seek. We therefore deny relators' claims for a writ of mandamus as to those respondents.

{¶ 42} But relators have shown that the board abused its discretion and disregarded applicable law in preparing and certifying ballot language stating that the use of two potential funding sources for the proposed affordable-housing trust fund would violate state law. Those legal opinions constitute impermissible persuasive argument against the proposed amendment. We grant a writ of mandamus to compel the board, forthwith, to prepare and certify new ballot language

regarding that matter in compliance with R.C. 3505.06(E) and to transmit the language to the secretary of state for the secretary's final approval under R.C. 3501.11(V). We deny the writ to the extent that relators seek additional relief against the board.

Writ granted in part<br>and denied in part.

O'CONNOR, C.J., and KENNEDY, FISCHER, and STEWART, JJ., concur.

DEWINE, J., concurs in part and dissents in part, with an opinion.

BRUNNER, J., concurs in part and dissents in part, with an opinion joined by DONNELLY, J.

———————————

**DEWINE, J., concurring in part and dissenting in part.**

{¶ 43} Supporters of a Cincinnati City Charter amendment ask this court for a writ of mandamus compelling changes to the ballot language that describes the proposal. A majority of this court rejects most aspects of the claim for relief but grants a writ directing the Hamilton County Board of Elections to remove statements indicating that certain aspects of the proposed amendment are not currently authorized by state law.

{¶ 44} I agree with the majority's decision in all but two respects. Unlike the majority, I would grant the writ with respect to the language in the introductory sentence of the ballot summary stating that the amendment would require an annual contribution to the proposed housing fund "using funding sources otherwise dedicated to providing for essential City services and public infrastructure needs." And I would deny the writ as to the language stating that an appropriation of revenue from the lease or sale of the Cincinnati Southern Railway "is currently prohibited by state law."

## I. The charter amendment does not mandate the use of funding sources "otherwise dedicated to" city services and infrastructure needs

{¶ 45} R.C. 3505.06(E) requires that ballot language "properly describe the * * * amendment proposed." As this court has explained, "R.C. 3505.06 serves to inform and protect the voter and presupposes a condensed text which is fair, honest, clear and complete." *State ex rel. Minus v. Brown*, 30 Ohio St.2d 75, 81, 283 N.E.2d 131 (1972).

{¶ 46} The proposed charter amendment seeks to establish an "Affordable Housing Trust Fund" and would require the Cincinnati City Council to appropriate a minimum of $50 million to the fund on an annual basis. To meet its obligations, the amendment directs city council to appropriate money from among the following sources: (1) the revenue from the lease or sale of the Cincinnati Southern Railway, (2) a fee for developers of certain nonresidential or large-scale residential projects, (3) a personal income tax on the award of stock options in publicly traded companies, and (4) the city's general operating fund.

{¶ 47} The opening clause of the ballot summary describing the proposed amendment states:

> Shall the Charter of the City of Cincinnati be amended to require a permanent, annual contribution of fifty million dollars ($50,000,000) of City funds to a new restricted fund for housing that is affordable to persons with low incomes and for related purposes *using funding sources otherwise dedicated to providing for essential City services and public infrastructure needs*, to be administered by an unelected volunteer board by enacting new Article XVII [of the Cincinnati City Charter] * * *.

(Emphasis added.) This language tells voters that the amendment would draw on funds that are otherwise dedicated to paying for essential city services and infrastructure needs. But that isn't the case. None of the potential funding sources contained in the amendment are *dedicated to* city services and infrastructure. Indeed, the most obvious source of funding—the city's general fund—can be and is used on a variety of expenditures unrelated to city services and infrastructure projects.

{¶ 48} The ballot language emphasized above goes beyond stating that the amendment could result in cuts to essential city services and infrastructure: it gives voters the false impression that the amendment would mandate that the city transfer money exclusively allocated for those purposes into the affordable-housing fund. The " 'average citizen' " knows what it means to say that funds have been dedicated for another use. Majority Opinion at ¶ 8, quoting *Markus v. Trumbull Cty. Bd. of Elections*, 22 Ohio St.2d 197, 259 N.E.2d 501 (1970), paragraph four of the syllabus. Such a statement is more than misleading to voters; it is simply untrue.

{¶ 49} I would therefore grant relators' request for a writ of mandamus directing the board of elections to remove that language from the ballot summary.

## II. Transfers of revenue from the Cincinnati Southern Railway are "currently prohibited by state law"

{¶ 50} As mentioned above, the charter amendment permits city council to pay for the affordable-housing fund using "revenue generated from the lease of the Cincinnati Southern Railway." The amendment further requires, "If revenue is generated from a sale of the Railway, all proceeds shall be placed in the Fund." With respect to that portion of the amendment, the ballot summary states that the affordable-housing fund is to be paid from "revenue from the lease or sale of the Cincinnati Southern Railway, *which appropriation is currently prohibited by state law*." (Emphasis added.)

{¶ 51} G.C. 15149 provides:

> [W]henever, in any city of the first class a railroad has been
> built, * * * all net earnings and incomes therefrom shall be paid into
> the treasury of said city to the credit of the sinking fund or bond
> retirement fund; and in the case of the sale or final disposition of
> said railroad, the purchase money or price shall be paid into the
> treasury of said city to the credit of the sinking fund or bond
> retirement fund and shall be applied to the reduction of the bonded
> debt of said city until the same shall be extinguished * * *.

(Ellipses in original.) 1949 Am.S.B. No. 200, 123 Ohio Laws 448. This law plainly states that proceeds from the railway must be paid into the sinking fund or bond-retirement fund.

{¶ 52} Additionally, Ohio law provides that a municipal corporation may transfer money out of the sinking fund or bond-retirement fund only "after all indebtedness, interest, and other obligations for the payment of which such fund exists have been paid and retired." R.C. 5705.14(C)(1). But even then, the city is not permitted to transfer money from these funds into any fund it wants. The statute requires the city to deposit any money being transferred out of one of those funds into the other. *Id.* ("the unexpended balance * * * shall be transferred, in the case of the sinking fund, to the bond retirement fund, and in the case of the bond retirement fund, to the sinking fund"). Only if either the sinking fund or the bond-retirement fund ceases to exist may money in that fund be transferred into another subdivision fund, and then only with the approval of the common pleas court. *Id.* Thus, Ohio law plainly prohibits shifting revenues generated by the railway to the affordable-housing fund.

{¶ 53} The majority does not conclude that there is anything misleading about saying that the proposed use of railway funds is prohibited by state law

18

(indeed, how could it?), but it orders that the language be removed anyway because it "would be inappropriate for this court to render an advisory opinion" on the matter. Majority opinion at ¶ 31. But no one has asked this court to render an advisory opinion. The simple question before us is whether relators have met their burden of showing that the language is inaccurate or misleading. They have not done so. Indeed, relators do not even argue that the statement is inaccurate or misleading.

{¶ 54} The majority also suggests that that the ballot language is improper because it constitutes a legal opinion on a question that the proposed amendment does not address. To the contrary, the language does not "introduce a new subject that [is] outside the terms of the proposed amendment." *State ex rel. Cincinnati for Pension Reform v. Hamilton Co. Bd. of Elections*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, ¶ 49. It directly addresses a term of the proposed amendment. Nor does this language challenge the legal validity of the proposed amendment itself. It merely informs voters that one of the directives contained in the amendment is not currently authorized by state law.

{¶ 55} We have long held that "[v]oters have the right to know what they are being asked to vote upon." *Id.* at ¶ 24; *see also Minus*, 30 Ohio St.2d at 80-81, 283 N.E.2d 131. The result of the majority's action today is that a voter who relies upon the ballot language will be left with the false impression that the housing fund can be financed, at least in part, by railway revenues. I see no need for this court to order a change that will result in voters being misled. I would therefore deny the request for a writ of mandamus relating to that language.

### III. Conclusion

{¶ 56} The ballot language stating that the charter amendment would require the city to pay for the affordable-housing fund "using funding sources otherwise dedicated to providing for essential City services and public infrastructure needs" is inaccurate and misleading, so I would grant relators'

request for a writ of mandamus directing the Hamilton County Board of Elections to remove that language from the ballot. But relators have not shown any inaccuracy in the language informing voters that Ohio law precludes the use of proceeds from the lease or sale of the Cincinnati Southern Railway for the affordable-housing fund, so I would deny the writ as to that statement. I join the majority's decision and judgment in all other respects.

_____

**BRUNNER, J., concurring in part and dissenting in part.**

{¶ 57} I join the majority's decision to grant a writ of mandamus against respondent Hamilton County Board of Elections ("the board"), as expressed in the majority opinion. However, I respectfully dissent from other aspects of the majority's judgment for several reasons. First, the writ should apply not just to the board, but also to respondent, the secretary of state. Second, the writ should require the board to address and rewrite an additional three sections of statutorily nonconforming ballot language.

### I. Why the Writ Should Also Issue as to the Secretary of State

{¶ 58} The duties and responsibilities of the secretary of state are critical to fair local ballot issue elections and should not readily be disregarded. In fact, R.C. 3501.05 outlines mandatory duties of the secretary of state. *See id.* ("The secretary of state shall do all of the following" in serving as "the state's chief election officer") R.C. 3501.04. Under R.C. 3501.05(J), the secretary of state has the express statutory authority—and duty—to "give final approval to ballot language for any local question or issue approved and transmitted by boards of elections under section 3501.11 of the Revised Code." R.C. 3501.05(J). What does this mean? It means that ballot language must properly inform local voters about the issues placed before them on local election ballots. *See* R.C. 3505.06(E). As we explained in *State ex rel Kilby v. Summit Cty. Bd. of Elections*, 133 OhioSt.3d 184, 2012-Ohio-4310, 997 N.E.2d 590, ¶ 19:

"R.C. 3505.06 serves to inform and protect the voter and presupposes a condensed text which is fair, honest, clear and complete, and from which no essential part of the proposed amendment is omitted." *State ex rel. Minus v. Brown*, 30 Ohio St.2d 75, 81, 283 N.E.2d 131 (1972). In evaluating the propriety of ballot language for local issues like charter amendments, we have applied the same three-part test that we apply in determining the validity of ballot language for a proposed constitutional amendment:

> "First, a voter has the right to know what it is he is being asked to vote upon. *State ex rel. Burton v. Greater Portsmouth Growth Corp.* (1966), 7 Ohio St.2d 34, 37 [218 N.E.2d 446]. Second, use of language which is 'in the nature of a persuasive argument in favor of or against the issue * * *' is prohibited. *Beck v. Cincinnati* (1955), 162 Ohio St. 473, 475 [124 N.E.2d 120]. And, third, 'the determinative issue * * * is whether the cumulative effect of these technical defects [in ballot language] is harmless or fatal to the validity of the ballot.' *State ex rel. Williams v. Brown* (1977), 52 Ohio St.2d 13, 19 [368 N.E.2d 838]; *State ex rel. Commrs. of the Sinking Fund v. Brown* (1957), 167 Ohio St. 71 [146 N.E.2d 287]."

(Brackets added in *Jurcisin*.) *Kilby* at ¶ 19, quoting *Jurcisin v. Cuyahoga Cty. Bd. of Elections*, 35 Ohio St.3d 137, 141, 519 N.E.2d 347 (1988) (charter amendment),

quoting *State ex rel. Bailey v. Celebrezze*, 67 Ohio St.2d 516, 519, 426 N.E.2d 493 (1981) (state constitutional amendment); *see also State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, ¶ 23-26 (citing three guidelines for evaluating ballot language: (1) voters have the right to know what they are voting for, (2) use of language in the nature of a persuasive argument in favor of or against the measure is prohibited, and (3) the determinative issue is whether the cumulative effect of the technical defects is harmless or fatal to the validity of the ballot language).

**{¶ 59}** This body of the state's election law applying R.C. 3505.06 and concerning ballot language for municipal-charter amendments is well-developed. At a minimum, the secretary of state must "[c]ompel the observance by election officers in the several counties of the requirements of the election laws." R.C. 3501.05(M). That did not happen in this case, and the secretary of state should embrace this duty and not attempt to dispel it.

**{¶ 60}** Specifically, Ohio law requires the secretary of state to instruct and direct local boards of elections on how to prepare ballot language under R.C. 3501.05(C), which requires the secretary of state to prepare rules and instructions for the conduct of elections, and R.C. 3501.11(P), which requires boards of elections to "perform other duties as prescribed by law or the rules, directives, or advisories of the secretary of state." Additionally, the secretary may act as a fifth voting member of each of the 88 county boards of elections in the event of a tie vote or disagreement. R.C. 3501.11(X).

**{¶ 61}** Based on these clear and important statutory mandates, I would hold that the secretary of state has the ultimate responsibility and a clear legal duty to ensure that local ballot language is fair, correct, accurate, and not misleading or argumentative. For the benefit of all Ohio voters and to guarantee full access to local self-governance through the ballot box, the secretary of state should be

required to ensure that local boards of elections follow the law, and thus, the writ should also issue as to the secretary of state.

## II. Why the Writ Should Require Additional Changes to the Ballot Language

{¶ 62} As to the particular ballot language in this case, I agree with the majority that the ballot language containing legal conclusions stating that the use of two potential funding sources would violate state law is inappropriate. However, I would go farther and require both the secretary of state and the board to follow the law regarding other ballot language.

### A. Ballot Language on the Selection of Trust-Fund Board Members

{¶ 63} The ballot language regarding how trust-fund board members would be selected and appointed is inaccurate and falls short of sufficiently informing voters of what they are being asked to vote upon. *Kilby*, 133 Ohio St.3d 184, 2012-Ohio-4310, 977 N.E.2d 590, at ¶ 19; *Cincinnati for Pension Reform*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, at ¶ 23-26. The proposed charter amendment outlines respondent Cincinnati City Council's role in appointing members to the trust-fund board, in part, as follows:

c) If any organization with authority to make a nomination under this Article cannot for any reason, or fails to submit its nomination to the Clerk within 30 days from the receipt of notice of a vacancy from the Clerk, *the President Pro Tem shall make such nomination, subject to the approval of Council* within 30 days.

d) If there is no successor to any organization referenced herein, *the nomination shall be made by the President Pro Tern of Council, subject to the approval of Council*.

e) A member shall serve until her successor takes office.

     f) *Council shall confirm all nominations* for appointment at the next meeting of Council.

(Emphasis added.)

{¶ 64} First, the inclusion of the word "unelected" in the ballot language to describe the members of the trust-fund board is unnecessarily argumentative. Under the proposed amendment, while the board members are not to be elected, they *are* to be appointed by city council. The argumentative nature of the word "unelected" is made worse by the omission from the ballot language of city council's role in the appointment of trust-fund board members. The language of the proposed amendment does not limit city council's role to a mechanical adoption of the nominees. Under the language of the proposed charter amendment, city council has nominating power, approval power, and confirmation power. Its role is not immaterial. Even though the proposed charter amendment's language requires city council to approve certain duly made nominations, the amendment contains language that requires city council through its president pro tempore to make other nominations and submit the nominations to city council for its discretionary approval.

{¶ 65} Because the ballot language does not accurately and without argument describe the process of how individuals will become members of the trust-fund board, "leav[ing] voters to speculate about who selects the [trust-fund board] members," *State ex rel. Voters First v. Ohio Ballot Bd.*, 133 Ohio St.3d 257, 2012-Ohio-4149, 978 N.E.2d 119, ¶ 34, and failing "to properly identify one of the key elements of the proposed * * * amendment," *id.* at ¶ 37, I would require the board and the secretary of state to revise this ballot language so that it accurately describes the trust-fund board and the process of being appointed to it.

### B. Ballot Language on the Potential Funding Sources

{¶ 66} In describing the potential funding sources for the trust fund in the ballot summary, the board of elections replaced the proposed charter amendment phrase "from among" with the phrase "to be paid from," and by doing so, it unnecessarily obfuscated the ballot language. The majority opinion says that the use of the disjunctive word "or" plainly indicates that funding need not be drawn from each of the listed sources, citing *In re Estate of Centorbi*, 129 Ohio St.3d 78, 2011-Ohio-2267, 950 N.E.2d 505, ¶ 18 ("use of the word 'or,' a disjunctive term, signifies the presence of alternatives"). While we have found the use of the word "or" to signify alternatives, the language at issue in *Centorbi* was not structured similarly to the language in the proposed charter amendment. In *Centorbi*, the choices relating to the use of the word "or" were essentially limited to two options, which is not the situation here. *See id.* at ¶ 17.

{¶ 67} Here, the proposed charter amendment permits funding from a combination of sources by using the phrase "from among." But using in the ballot summary the phrase "to be paid from" in conjunction with a numbered list in which the word "or" appears *only* before the last alternative creates the impression that only one alternative may be selected from the numbered list.

{¶ 68} Because the language of the proposed charter amendment expressly permits funding "from among" a number of different sources, I see no reason for changing what is actually fewer words that are unambiguous to more words that dissemble the proposal's meaning. The clear and correct language used in the proposed charter amendment—"from among"—was unnecessarily modified in the ballot language and does not properly describe the proposed amendment. R.C. 3505.06(E). For this reason, I would extend the writ to require the use of the two simple words from the proposed charter, "from among."

{¶ 69} Additionally, the ballot language omits a potential funding source that must be included for any Cincinnati voter to make an informed choice on

whether to vote to amend the city charter. *See Kilby*, 133 Ohio St.3d 184, 2012-Ohio-4310, 977 N.E.2d 590, at ¶ 19; *Cincinnati for Pension Reform*, 137 Ohio St.3d 45, 2013-Ohio-4489, 997 N.E.2d 509, at ¶ 23-26. The proposed charter amendment provides: "Nothing herein shall be construed to permit the council to raise revenue for purpose of this Article through an increase in the rate of income tax unless the issue is first submitted to a vote of the electorate." City council argues that including this potential source of funding in the ballot summary would be misleading because, in its opinion, it is a "theoretical future tax" and it therefore should not be included on the ballot.

{¶ 70} Omitting ballot language about a voter-approved tax increase to help cover the proposed $50 million appropriation will deny voters reading the ballot language the right to know what it is they are being asked to vote on. Omitting the fact that voter approval is required for the city income-tax rate to be increased to help fund an additional $50 million appropriation instead of taking that money from the present and succeeding budgets denies voters information that surely might move them one way or another concerning the proposed charter amendment. For instance, some might like the idea of controlling their municipal-taxation destiny through an "automatic" referendum to decide whether they will pay more taxes. But others might harbor doubts about whether a tax increase would ever occur and may fear the impact of a $50 million budgetary loss on vital city services in each municipal budget cycle.

{¶ 71} In short, information about whether a tax increase as a potential funding source for the $50 million appropriation is subject to voter approval is critical to a voter's understanding of the consequences of mandating that $50 million come "off the top" of any new city budget for the purposes of the housing-trust fund. Had this kind of transparency been observed in creating the ballot language, there would have been little need to include language that is not in the proposed charter amendment stating that the $50 million appropriation in each

26

budget cycle would come from "funding sources otherwise dedicated to providing for essential City services and public infrastructure needs." In section I of the first separate opinion, the author discusses problems with this language, and I concur with section I of that opinion and agree that a writ should issue as to this language. The above-quoted language does not comport with R.C. 3505.06, because it is inaccurate and misleading for the reasons stated in the separate opinion and therefore does not properly describe the proposed charter amendment. A writ should issue to require the board of elections to modify this portion of the ballot language. Similarly, and contrary to city council's argument, the proposed tax-increase-funding-source language is not theoretical; nor is it prohibitory—it is explanatory and forms a proper description of the proposed charter amendment and should be included as part of the ballot language.

### III. Conclusion

{¶ 72} For these reasons, I join the majority's decision to grant the writ concerning the ballot language that involves legal conclusions regarding two potential funding sources, but I would extend the writ beyond what the court grants. I would extend the writ to the secretary of state for the statutory reasons stated above. And I would require the board of elections to certify to the secretary of state new language in accordance with its duty under the law to properly describe the proposed charter amendment free from argumentative, inaccurate, or misleading language, with the secretary in turn being required to exercise his powers under R.C. 3501.05 and to ensure that the local ballot language complies with R.C. 3505.06(E) and "properly describes the question, issue or * * * amendment proposed."

{¶ 73} Relators are entitled to this relief, having properly circulated and received certification of a valid petition for a charter amendment to be submitted to the electors of the city of Cincinnati for the May 4, 2021 primary election. Most importantly, the electors of the city of Cincinnati are entitled under R.C. 3505.06(E)

to ballot language that properly describes for them just what they are being asked to vote on concerning the proposed charter amendment. Accordingly, I concur in the majority's judgment in part and dissent in part.

DONNELLY, J., concurs in the foregoing opinion.

_____

McTigue & Colombo, L.L.C., Donald J. McTigue, J. Corey Colombo, Derek S. Clinger, and Ben F.C. Wallace, for relators.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and David T. Stevenson and Jesse K. Daley, Assistant Prosecuting Attorneys, for respondent Hamilton County Board of Elections.

Dave Yost, Attorney General, and Heather L. Buchanan and Caitlyn N. Johnson, Assistant Attorneys General, for respondent Ohio Secretary of State Frank LaRose.

Andrew W. Garth, Cincinnati City Solicitor, Emily Smart Woerner, Deputy City Solicitor, and Erica Faaborg, Assistant City Solicitor, for respondent Cincinnati City Council.

Lazarus & Lewis, L.L.C., Stephen S. Lazarus, and Kimberly Rutowski, urging denial of the writ for amicus curiae Cincinnati Fraternal Order of Police, Queen City Lodge No. 69.

Vorys, Sater, Seymour & Pease, L.L.P., Jacob D. Mahle, Petra G. Bergman, and John J. Kulewicz, urging denial of the writ for amici curiae Keep Cincinnati Beautiful; Ohio Council 8, American Federation of State, County and Municipal Employees, AFL-CIO; and The Port of Greater Cincinnati Development Authority.

Minnillo Law Group Co., L.P.A., and Robb S. Stokar, urging denial of the writ for amicus curiae Cincinnati Organized and Dedicated Employees, Inc.

_____