[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. LeadingAge Ohio v. Ohio Dept. of Medicaid*, Slip Opinion No. 2025-Ohio-3066.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-3066

THE STATE EX REL. LEADINGAGE OHIO ET AL. *v.* OHIO DEPARTMENT OF MEDICAID ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. LeadingAge Ohio v. Ohio Dept. of Medicaid*, Slip Opinion No. 2025-Ohio-3066.]

*Mandamus—Writ sought to compel Department of Medicaid and its director to recalculate and pay nursing-home quality incentive payments according to formula set forth in R.C. 5125.26—Department and directory failed in their duty to apply R.C. 5125.26 as enacted by General Assembly—Writ granted but request for attorney fees and expenses denied.*

(No. 2024-1075—Submitted April 1, 2025—Decided September 2, 2025.)

IN MANDAMUS.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, BRUNNER, DETERS, HAWKINS, and SHANAHAN, JJ.

**Per Curiam.**

{¶ 1} Medicaid pays the cost of nursing-home care for Medicaid recipients based on several factors. One is the nursing home's per diem "rate for direct care costs," which is periodically reassessed through a process called "rebasing." Another factor is the nursing home's per diem "quality incentive payment rate," which is used to determine how much the nursing home receives from a pool of funds (the "quality-incentive pool" or "pool") and is proportionate to the quality of care the nursing home provides relative to other nursing homes.

{¶ 2} The General Assembly recently decided to prioritize the quality incentives. In the 2024-2025 biennial budget legislation, it amended the statutory formula that is used to determine the amount to allocate to the quality-incentive pool. The formula shifts the total Medicaid reimbursement for nursing homes more toward the quality incentive payment rate by mandating that 60 percent of the increase in funding from rebasing be allocated toward the quality incentive payment rate, with 40 percent of the increase allocated toward the base rate paid to each nursing home.

{¶ 3} Respondents, the Ohio Department of Medicaid and Maureen M. Corcoran, the department's director (collectively, "the department"), applied this amended law and recalculated the quality-incentive pool. But relators, LeadingAge Ohio, Ohio Health Care Association, and the Academy of Senior Health Sciences, Inc. (collectively, "the associations"), assert that the department did not follow the formula the legislature had prescribed for determining the size of this pool. In calculating the amount to allocate to the pool, the department used the increase in the price of care, claiming that this was the same as the increase in the rate for direct care costs. The associations seek a writ of mandamus on behalf of their member nursing homes to force the department to recalculate the amount of money allocated to incentivize high-quality care and to follow the formula the legislature prescribed when it does so.

{¶ 4} The associations insist that this money should be allocated according to the text of the statute—R.C. 5165.26(E). The department counters that it has already done so, stating that its interpretation is in line with the intent of the General Assembly. The department has also filed a motion to dismiss this case as moot because the funds appropriated by the 2024-2025 biennial budget legislation have expired. We deny the motion to dismiss, and because the department's interpretation deviates from the text of the statute, we grant the writ.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 5} There are approximately 926 Medicaid-certified nursing facilities in Ohio that provide medical and personal care to about 66,000 individuals, most of whom are elderly. Medicaid pays for the care of approximately 65 percent of all residents in Ohio nursing homes through a daily payment rate for each day of care a resident receives in a facility. The statutory scheme for calculating how much Medicaid will pay a particular nursing home for each day of care it provides is complex because of the various factors that go into the determination. This case deals with only two of the many factors—the "rate for direct care costs" and the "quality incentive payment rate."

{¶ 6} First, the rate for direct care costs is part of the base rate that Medicaid will pay a given nursing home each day that a Medicaid beneficiary resides in the nursing home (a "Medicaid day"). *See* R.C. 5165.26(A)(1) (defining "base rate" as "the portion of a nursing facility's total per Medicaid day payment rate determined under divisions (A) and (B) of section 5165.15 of the Revised Code"). The base rate is not tied to the nursing home's performance, and the Ohio Department of Medicaid is required to update this rate every few years through a process called "rebasing," to reflect the increases in costs over time. *See* R.C. 5165.01(SS). Each time the nursing homes' base rates are rebased, the "cost per case-mix unit" increases to reflect the increased cost of care. The per diem "cost per case-mix unit" is colloquially known as the "price of care" or just the "price." The nursing

homes are divided into several groups, with the nursing homes of each group having similar operating costs, and the "price" is specific not to individual nursing homes but to all the nursing homes in a given group. R.C. 5165.19(C)(1).

{¶ 7} To establish the rate for direct care costs for a particular nursing home within the group, the department multiplies the price of care in that nursing home's group by the nursing home's individualized acuity rate or "case-mix score." R.C. 5165.19(A)(1). The case-mix score reflects the complexity of care offered at a given nursing home (and therefore the expenditure at that facility compared to the average in the group). R.C. 5165.01(H). The case-mix score is recalculated semiannually. R.C. 5165.192. The price is rebased at least every five years. In short, the price is one of the two factors in determining the rate for direct care costs, and the amount that a facility's rate for direct care costs changes every time the price is rebased is equal to the product of the change in the group's price and the facility's case-mix score.

{¶ 8} The second of the rates germane to this dispute is the quality incentive payment rate. The quality incentive payment rate reflects an individual nursing home's achievement of certain quality standards. Each facility receives funds from the quality-incentive pool in proportion to the facility's quality score. R.C. 5165.26(B). The size of the pool is determined by an equation set forth in R.C. 5165.26(E). To determine the value of each quality point in a nursing home's quality score, the department divides the amount of money in the pool by the number of statewide Medicaid days in the previous year and by the average quality score of nursing homes in the state. R.C. 5165.26(B)(1) through (5). Thus, each of the following increases the value of each point: a lower average quality score, a lower number of Medicaid days in the previous year, and a larger pool.

{¶ 9} The quality incentive payment rate of a given nursing home is the value per point multiplied by the number of points that the particular nursing home receives when it is assessed for its quality of care, i.e., its quality score.

R.C. 5165.26(B)(6).  In simpler terms, each nursing home's points determine how many slices of the pie that nursing home gets, and the value of each point determines the width of each slice of the pie.

{¶ 10} This case, though, is about the size of the pie itself, that is, it is about how much money the equations in the statute allocate to the quality-incentive pool.  In the budget legislation passed for the 2024-2025 biennium, the legislature amended the way the department is to allocate funds to the pool by mandating that the department take a certain percentage of the increase in funding resulting from rebasing and allocate it to the quality-incentive pool.  According to the statute as amended, the pool starts with a base amount ($125 million) and to that amount, the department adds a specific amount for each nursing facility in the State.  R.C. 5165.26(E)(2) and (3).  For each facility, the department calculates the amount to add to the pool by multiplying the sum of several daily-valuation factors by the number of the facility's Medicaid days during the previous year.  R.C. 5165.26(E)(1).  Only one of the daily-valuation factors is in dispute here.  The relevant factor adds "sixty per cent of the per diem amount by which the nursing facility's rate for direct care costs determined for the fiscal year . . . changed as a result of the rebasing conducted."  R.C. 5165.26(E)(1)(a).  To compensate for this portion of Medicaid funds being allocated to the quality-incentive pool, the legislature reduced the increase in the base rate for each nursing home to "forty percent of the increase in its rate for direct care costs due to the rebasing conducted."  2023 Am.Sub.H.B. No. 33, § 333.300 ("H.B. 33").

{¶ 11} When it calculated the pool, the department calculated into each facility's daily valuation 60 percent of the change in the price, not 60 percent of the change in the rate for direct care costs.  The department does not dispute that it took this action.  Instead, it argues that this calculation is in line with the statute.

{¶ 12} The associations filed this original action in July 2024.  They seek a writ of mandamus ordering the department to calculate and pay nursing-home

quality incentive payments from July 1, 2023, forward according to the formula in R.C. 5125.26—specifically, to use the rate for direct care costs instead of the price in performing the calculation required by R.C. 5165.26(E)(1)(a). The department filed an answer and a motion for discovery and a scheduling order. We denied the department's motion and granted an alternative writ, setting a schedule for the submission of evidence and briefs. 2024-Ohio-5173. The parties subsequently submitted evidence, and the case has been fully briefed.

{¶ 13} The associations argue that the department's calculation clearly reflects a misreading of the statute. They point out that R.C. 5125.26(E)(1)(a) specifies that the contribution to the quality-incentive pool, for each nursing home for each of the nursing home's Medicaid days for the prior year, includes 60 percent of the change in the "rate for direct care costs" that is determined "as a result of the rebasing conducted." If the legislature had meant 60 percent of the change in the price (i.e., the "cost per case-mix unit"), they argue, the legislature would have said that. They point out that the statute specifies that the amount the "rate for direct care costs" changes as a result of rebasing must be used in the calculation, not the amount the price changes as a result of rebasing. The change in a nursing home's rate for direct care costs as a result of rebasing actually amounts to the nursing-home group's change in price multiplied by the nursing home's case-mix score.

{¶ 14} The associations next point out that R.C. 5125.26(E)(1) requires the department to determine the change "for each nursing facility." But the change in price, which is the change that the department asserts is the correct change to use in the formula, is the same for all the nursing homes in a given group, so if that is what the General Assembly meant, then there would be no need for it to direct the department to determine the change "for each nursing facility." The change in the rate for direct care costs, on the other hand, is nursing-home specific, so, consistent with R.C. 5125.26(E)(1), the change does need to be determined "for each nursing facility.

6

{¶ 15} Although it recognizes that the words in R.C. 5165.26(E)(1)(a) read change in the "rate for direct care costs" as a result of rebasing, not change in the "cost per case-mix unit" (i.e., the price) as a result of rebasing, the department argues that the change in the rate for direct care costs as a result of rebasing amounts to only a change in the price, not a change in the rate for direct care costs. Therefore, the department contends, a nursing home's case-mix score should not be included in calculating the amount to allocate to the quality-incentive pool. The department says that "it is illogical to argue [that] the legislature intended" to use 60 percent of the change in the rate for direct care costs, rather than 60 percent of the change in the price, when determining how much to allocate to the pool. The department focuses on the phrase "changed as a result of the rebasing conducted," R.C. 5165.26(E)(1)(a), arguing that by this phrase, the General Assembly meant the change in the price, even though it did not say the price. The department suggests that any other interpretation would make this phrase superfluous.

## II. ANALYSIS

### A. This case is not moot

{¶ 16} After this case was fully briefed and submitted for our decision, the department filed a motion to dismiss the case as moot. Because the funds appropriated by the General Assembly in the 2024-2025 biennial budget legislation have expired, the department argues that the associations cannot obtain the relief they seek. The department is wrong.

{¶ 17} This case is not simply about the appropriation of funds for the 2024-2025 biennium. The associations seek a writ of mandamus "ordering [the department] to calculate and pay all nursing facility quality incentive payments, dating from July 1, 2023 forward, as required pursuant to the plain, unambiguous language of Revised Code section 5165.26 as amended by the [2024-2025] Budget Legislation." Put another way, the associations are asking this court to order the department to comply with the formula for reimbursement set forth in R.C.

5165.26. While that statute was amended as part of the H.B. 33 budget legislation enacted for the 2024-2025 biennium, the statute—unlike the appropriations—did not expire at the end of the biennium. The formula in R.C. 5165.26, in particular the disputed language in R.C. 5165.26(E), remains in place.[1] Therefore, the issue whether the department is properly calculating the payment required by the statute remains a live controversy.

{¶ 18} We therefore deny the department's motion to dismiss this case as moot.

### B. Department's motion to amend affidavits is denied

{¶ 19} As a side issue, the associations argue that the affidavits the department submitted as evidence do not comply with the Supreme Court Rules of Practice and should be stricken. S.Ct.Prac.R. 12.06(A) requires affidavits to be "made on personal knowledge." But each affidavit at issue states: "The evidence set forth in this affidavit is based on my personal knowledge, *or the statements are true to the best of my knowledge and belief*." (Emphasis added.) The associations contend that the emphasized clause makes the affidavits inadmissible.

{¶ 20} In response, the department has submitted a motion to amend the affidavits, along with amended affidavits that do not include the italicized clause set forth above. Other than the removal of the clause, the proposed amended affidavits are the same as the original affidavits.

{¶ 21} We have held, in the context of a motion for summary judgment, that an affidavit that states that the facts therein "are true to the best of [the affiant's] knowledge and belief" is not necessarily inadmissible under Civ.R. 56(E). *State ex rel. Corrigan v. Seminatore*, 66 Ohio St.2d 459, 467-468 (1981). As in federal courts, if an Ohio court can differentiate between which averments are based on

---

1. After the passage of H.B. 33, R.C. 5165.26 was amended in 2024 Sub.S.B. No. 144. However, the language at issue in R.C. 5165.26(E) was unchanged.

knowledge and which are based on belief, then the court need not strike the affidavit but may simply admit the parts based on knowledge and strike those based on belief. *See Ondo v. Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015). The use of the phrase "to the best of my knowledge and belief" does not render an affidavit submitted as evidence per se inadmissible in toto but may speak to the weight the affidavit should be given.

{¶ 22} Here, we can discern which statements are based on the affiants' knowledge in the original affidavits. Moreover, this case does not turn on the affidavits but on our interpretation of the law. We therefore reject the assertion that the affidavits should be stricken, and we deny as unnecessary the motion to amend.

## C. The associations have established that they are entitled to a writ

{¶ 23} To be entitled to a writ of mandamus, a relator must show that a public officer or agency "is under a clear legal duty to perform an official act, the relator is being denied a private right or benefit by the officer's or agency's failure to perform that official act," and the relator has no adequate remedy in the ordinary course of law. *State ex rel. McCarley v. Dept. of Rehab. & Corr.*, 2024-Ohio-2747, ¶15, citing *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 162-164 (1967).

{¶ 24} Here, the associations filed their complaint on behalf of their member nursing facilities, which have a right to receive the benefits of Medicaid payments in the amount established by statute. And "when nursing homes and their trade association seek to challenge a state agency's denial of requests for reconsideration of Medicaid reimbursement rates . . . the exclusive avenue of relief available to the nursing homes is to pursue a writ of mandamus." *Ohio Academy of Nursing Homes v. Ohio Dept. of Job & Family Servs.*, 2007-Ohio-2620, ¶1. In other words, as the associations have already requested in vain that the department reconsider its interpretation of R.C. 5165.26(E), the associations have no plain and adequate remedy in the ordinary course of law. Accordingly, the associations have

shown that if the department failed in its duty to perform an official act, they are entitled to the requested writ.

1. *The department used the change in the price to calculate the size of the pool, but the statute directs it to use the change in the rate for direct care costs*

{¶ 25} The parties disagree over what R.C. 5165.26(E)(1)(a) requires the department to include in its calculation of how much money to allocate to the quality-incentive pool. The department argues that it should factor in the change in price for each nursing home since the prior year, but the associations argue that it should factor in the change in the rate for direct care costs for each nursing home since the prior year.

{¶ 26} When we interpret statutes, we aim to determine the meaning that the General Assembly gave the statute. *E.g.*, *State ex rel. Canales Flores v. Lucas Cty Bd. of Elections*, 2005-Ohio-5642, ¶ 25. A court can know the meaning a legislature gives a statute through the words the General Assembly enacted into law, and we read those words in accordance with their ordinary meaning. *See, e.g.*, *State ex rel. Brinda v. Lorain Cty. Bd. of Elections*, 2007-Ohio-5228, ¶ 22. We look beyond those words only when their meaning is unclear. *Id.* at ¶ 25. Accordingly, when a statute is clear, we need only read and apply it; we do not read any additional meaning into it. *E.g.*, *Storer Communications, Inc. v. Limbach*, 37 Ohio St.3d 193, 194 (1988).

{¶ 27} The statutory language at issue here is unambiguous. R.C. 5165.26(E) says that the "total amount to be spent on quality incentive payments" under R.C. 5165.26(B) "shall be determined" under the formula set forth in R.C. 5165.26(E)(1) through (3). The part of the formula at issue in this case says that for each nursing home, the department is to determine the amount that is "sixty per cent of the per diem amount by which the nursing facility's rate for direct care costs determined for the fiscal year under section 5165.19 of the Revised Code changed as a result of the rebasing conducted under section 5165.36 of the Revised Code."

R.C. 5165.26(E)(1)(a). Under the plain words of the statute, therefore, the amount to be multiplied by 60 percent is the amount by which the rate for direct care costs changed as a result of rebasing.

{¶ 28} The associations claim that to find the amount that the rate for direct care costs changed, the department must calculate the rate for direct care costs for the previous year and the rate for direct care costs for the current year and then subtract the previous rate from the current rate. Since a facility's rate for direct care costs for each year is the price for that facility's group multiplied by the facility's case-mix score, the associations assert that there is no way to be faithful to the statute while only factoring in 60 percent of the change in the price.

{¶ 29} The department focuses on the phrase "changed as a result of the rebasing conducted," R.C. 5165.26(E)(1)(a). It asserts that the amount of change as a result of rebasing is the change in the price because only the price is directly affected by rebasing. It asserts that if the legislature meant the change in the rate for direct care costs, it would have omitted the phrase "as a result of the rebasing conducted."

{¶ 30} The logic of this argument cuts against the department. The legislature could have directed the department to use the change in the price (i.e., the change in the "cost per case-mix unit") as a result of rebasing. But instead, the legislature has directed the department to use the change in the rate for direct care costs as a result of rebasing. An individual nursing home's change in rate for direct care costs due to rebasing is the change to the price multiplied by that nursing home's case-mix score. The department's interpretation does not reflect what the enacted legislation says, and it dramatically shortchanges the statutorily mandated increase to the quality-incentive pool.

{¶ 31} Although it is true that the price changes *directly* as a result of rebasing, the resulting effect of the rebasing of the price is a change in the rate for direct care costs, because the change in the rate for direct care costs is calculated

by multiplying the change in the price by the case-mix score. So the change in the price in a given nursing-home group as a result of rebasing factors into the change in the individual nursing home's rate for direct care costs as a result of rebasing.

{¶ 32} In mathematical terms, the associations argue that the change in the rate for direct care costs for a nursing home as a result of rebasing ("$\Delta R_D$") is equal to the change in price of the nursing home's group ("$\Delta P$") multiplied by the nursing home's case-mix score (assuming that the score remains the same) ("$S_c$")—i.e., $\Delta R_D = \Delta P \times S_c$. Here is how the associations reach that result. The formula for the change in the rate for direct care costs of a nursing home is the rate for direct care costs of the first year ("$R_{D1}$") subtracted from the rate for direct care costs of the second year ("$R_{D2}$")—i.e., $\Delta R_D = R_{D2} - R_{D1}$. And the rate for direct care costs for a nursing home in any given year ("$R_{Dn}$") is the price ("$P$") of the nursing home's group multiplied by the nursing home's case-mix score ("$S_c$")—i.e., $R_{Dn} = P \times S_c$. So, substituting the calculation for the rate for direct care costs into the change-in-rate-for-direct-care-costs formula, the change in the rate for direct care costs equals the product of the price in the first year ("$P_1$") and the case-mix score of the first year ("$S_{C1}$") subtracted from the product of the price in the second year ("$P_2$") and the case-mix score of the second year ("$S_{C2}$")—i.e., $\Delta R_D = (P_2 \times S_{C2}) - (P_1 \times S_{C1})$. Assuming that the case-mix score is the same in both years, the change in the rate for direct care costs is equal to the case-mix score multiplied by the difference between the price of the second year and the price of the first—i.e., $\Delta R_D = S_C(P_2 - P_1)$, which equals $\Delta P \times S_c$.

{¶ 33} Yet the department argues that the change in rate for direct care costs as a result of rebasing is equal to the change in the price—i.e., $\Delta R_D = \Delta P$. But since $(P_2 - P_1) = \Delta P$, the only way that the department's assessment could be correct is if the case-mix score were always 1—i.e., $\Delta R_D = 1(P_2 - P_1) = (P_2 - P_1) = \Delta P$. This is clearly not the case. Therefore, it is not true that the change in

the rate for direct care costs as a result of rebasing is nothing more than the change in the price.

{¶ 34} For example, if the price in the first year is $150 and the price in the second year is $200, the change in the price is $50. If a particular nursing home has a case-mix score of 2.0, the rate for direct care costs the first year would be $150 x 2.0, or $300, and the rate for direct care costs of that nursing home in the second year would be $200 x 2.0, or $400. The change in the rate for direct care costs for that nursing home, therefore, would be $400-$300, or $100. Under the department's logic, 60 percent of the change in the price would be used to calculate the amount to allocate to the quality-incentive pool: 60 percent of $50, or $30. Under the statute's terms, 60 percent of the change in the rate for direct care costs should be used: 60 percent of $100, or $60. Thus, the department's use of the price results in less of an increase to the quality-incentive pool than would occur if the department used the rate for direct care costs, as the General Assembly instructed it to do.

{¶ 35} The department says that the associations' interpretation countermands the legislature's intention to increase the incentive for high-quality care. According to the department, since the case-mix score corresponds to complexity of care, factoring it into the quality incentive will incentivize low-quality complex care. This is not true. The amount determined using the formula in R.C. 5165.26(E)(1)(a) factors into the size of the quality-incentive pool, not how much an individual nursing home will draw from the pool. A rising tide lifts all boats, so the department is correct that complex-care nursing homes may receive more from the pool when the pool is bigger than they would with the smaller pool the department calculated. But high-quality nursing homes will get a larger proportion of the pool, regardless.

{¶ 36} In other words, under R.C. 5165.26(B), high-quality nursing homes always receive more slices of the pie. Adding the case-mix score into this initial

calculation does not change the number of slices of the pie or the number of slices given to each nursing home. Instead, it changes the overall size of the pie. With a bigger pie, each slice will be larger. Every nursing home will get more for its quality points. Thus, the department's argument fails.

{¶ 37} In sum, when a statute is unambiguous, we apply it as written. *State ex rel. Plain Dealer Publishing Co. v. Cleveland*, 2005-Ohio-3807, ¶ 38. R.C. 5165.26(E) plainly requires the department to factor into the quality-incentive pool 60 percent of the change in the rate for direct care costs, not 60 percent of the change in price. The department's contrary arguments questioning the policy underlying the legislation and the General Assembly's intent in enacting it are inappropriate in the face of the clear language of the statute. The associations have proved that the department failed in its duty to apply the statute as enacted by the General Assembly.

### 2. *The department's unclean-hands argument falls short*

{¶ 38} The department also argues that mandamus relief is not appropriate in this case, because the associations' hands are unclean. It asserts that the associations participated in the negotiations regarding the budget legislation that included the statutory-formula amendments and therefore either knew or should have known that the department would calculate the quality-incentive pool as it did. Since the department falls far short of alleging the reprehensible conduct required for this defense to be successful, this argument fails.

{¶ 39} Unclean hands is an equitable defense not generally applicable to actions at law, though we have sometimes nevertheless recognized the defense in mandamus cases. *See State ex rel. Morgan v. New Lexington*, 2006-Ohio-6365, ¶ 53, citing *State ex rel. Albright v. Haber*, 139 Ohio St. 551, 553 (1942) (recognizing unclean hands as a defense based on a court's discretion to deny mandamus relief); *see also State ex rel. Miller v. Hamilton Cty. Bd. of Elections*, 2021-Ohio-831, ¶ 16 (noting in a prohibition action that we have occasionally

recognized the "potential applicability" of the unclean-hands defense in mandamus actions). But for unclean hands to bar relief, the respondent must show that the relator engaged in reprehensible conduct, not merely negligent conduct. *See State ex rel. Columbus Coalition for Responsive Govt. v. Blevins*, 2014-Ohio-3745, ¶ 12; *see also State ex rel. Coughlin v. Summit Cty. Bd. of Elections*, 2013-Ohio-3867, ¶ 16 (determining that a relator's benefiting from legislation that he drafted while serving in the General Assembly was not reprehensible conduct preventing his seeking mandamus relief to enforce compliance with the legislation).

**{¶ 40}** The department has presented evidence showing only that the associations are trying to get exactly the allocation of funding that R.C. 5165.26(E) requires. Ensuring that the department applies the statute as written is not reprehensible but laudable, so we reject the department's unclean-hands defense.

*3. Requests for attorney fees and expenses require argument in support, but costs are awarded by operation of statute*

**{¶ 41}** Finally, in their complaint, the associations request an award of costs, expenses, and reasonable attorney fees. Other than one conclusory sentence in their merit brief and reply brief, neither of which included a citation to authority, they present no arguments explaining why they should receive costs, expenses, or attorney fees. Thus, they have waived their request for attorney fees and expenses. *See State ex rel. Shamro v. Delaware Cty. Bd. of Elections*, 2025-Ohio-941, ¶ 21 (the relator waived his claim for awards of attorney fees and expenses by failing to include a separate argument in his briefs concerning such awards). But in general, costs[2] in mandamus cases are awarded to the victor by operation of R.C. 2731.11

---

2. Costs generally exclude attorney fees and expenses unless a statute specifies otherwise. *See State ex rel. Williams v. Colasurd*, 1995-Ohio-236, ¶ 8 ("expenses" and "costs" are not synonymous); *State ex rel. Cincinnati Action for Housing Now v. Hamilton Cty. Bd. of Elections*, 2021-Ohio-1038, ¶ 40, quoting *State ex rel. Dellick v. Sherlock*, 2003-Ohio-5058, ¶ 55 ("'absent a statute allowing attorney fees as costs, the prevailing party is not entitled to an award of attorney fees unless the party against whom the fees are taxed acted in bad faith'"). R.C. 2731.11 does not specify otherwise.

and 2731.12. *See also* S.Ct.Prac.R. 18.05(A)(2)(c) (taxing costs against the respondent when a writ is granted and issued). We therefore deny only the associations' request for attorney fees and expenses because they presented no argument in support of this request.

### III. CONCLUSION

{¶ 42} We deny the department's motion to dismiss this case as moot because the department has an ongoing duty to allocate Medicaid funds according to the statutes the General Assembly has passed. And because the department has not done so here, we grant a writ of mandamus ordering it to recalculate the quality-incentive pool based on the words the legislature enacted—using the change in the rate for direct care costs, not merely the change in the price for its calculation under R.C. 5165.26(E)(1)(a). We also deny the department's motion to amend the affidavits it submitted as evidence and the associations' unsupported request for expenses and reasonable attorney fees.

Writ granted.

_____

Barnes & Thornburg, L.L.P., David Paragas, and Kian Hudson; Rolf Goffman Martin Lang, L.L.P., Aric D. Martin, and Joseph F. Petros III, for relators.

Frost Brown Todd, L.L.P., Frank J. Reed Jr., and Ryan W. Goellner, for respondents.

_____